GEORGE BLOOD ENTERPRISES, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent GEORGE W. BLOOD and JO ANN BLOOD, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, RespondentGeorge Blood Enterprises, Inc. v. CommissionerDocket Nos. 1993-72, 1994-72, 6148-72, 6149-72.United States Tax CourtT.C. Memo 1976-102; 1976 Tax Ct. Memo LEXIS 300; 35 T.C.M. (CCH) 436; T.C.M. (RIA) 760102; March 31, 1976, Filed Patrick M. Pilachowski, for the petitioners. Thomas J. Miller, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent*302 determined deficiencies in the Federal income tax of petitioner George Blood Enterprises, Inc. for the taxable years ended June 30, 1967, 1968 and 1970 in the amounts of $32,033.74, $14,806.64 and $2,707.17, respectively, and additions to tax under section 6651(a), I.R.C. 1954, 1 of $8,008.44 for the taxable year ended June 30, 1967 and $676.79 for the taxable year ended June 30, 1970. Respondent determined deficiencies in the Federal income tax of petitioners George W. and Jo Ann Blood for the calendar years 1967, 1968, 1969 and 1970 in the amounts of $11,399.00, $7,959.00, $3,727.44 and $3,105.54, respectively, and additions to tax under section 6651(a)(1) for the years 1967, 1969 and 1970 in the amounts of $2,849.75, $186.37 and $776.39, respectively. Some of the issues raised by the pleadings have been disposed of by agreement of the parties. The only issue remaining for decision with respect to petitioner George Blood Enterprises, Inc. is whether advances received by this petitioner from insurance companies for which it acted as general agent constitute income when received or whether*303 such advances were loans. The remaining issues for decision with respect to petitioners George W. and Jo Ann Blood are: (1) Whether amounts received from George Blood Enterprises, Inc. of which Mr. Blood is sole shareholder, constitute dividends or whether such amounts were proceeds of loans made by the corporation to him; and (2) whether petitioners are entitled to deduct certain expenditures in 1968, 1969 and 1970 as business expenses. FINDINGS OF FACT George W. and Jo Ann Blood, husband and wife, who resided in North Little Rock, Arkansas at the time of the filing of their petition in this case, filed joint Federal income tax returns for the calendar years 1967, 1969 and 1970 with the District Director of Internal Revenue at Little Rock, Arkansas. Petitioners' joint return for 1968 was filed with the Director, Internal Revenue Service Center at Austin, Texas. 2*304 George Blood Enterprises, Inc. (Enterprises), an Arkansas corporation, with its principal place of business in Little Rock, Arkansas at the time of the filing of its petition in this case, filed its Federal corporate income tax returns (Form 1120) for its fiscal years ended June 30, 1967, 1969, and 1970 with the District Director of Internal Revenue at Little Rock, Arkansas. 3Enterprises upon its incorporation under the laws of the State of Arkansas in June of 1966 adopted a fiscal year ending June 30 as its taxable year. Mr. Blood is president of Enterprises and has been the sole shareholder of the corporation since its inception. 4During the years*305 in issue, Enterprises acted as general agent for Empire Life Insurance Company of America (Empire). Mr. Blood originally became associated with Empire on January 14, 1964, in his individual capacity as an agent of the company to solicit insurance applications. The terms of the association were set forth in a contract entitled "Associate's Agreement." On January 4, 1967, Empire and Mr. Blood executed an acknowledgment that henceforth George Blood was to be known as George Blood Enterprises, Inc. and that the substitution of Enterprises on the contract with Empire would in no way effect the terms of the original contract or any supplements thereto previously entered into between Mr. Blood and Empire. Under the "Associate's Agreement" with Empire, Enterprises was authorized to solicit and procure applications for insurance with Empire in the State of Arkansas and in all other states where Empire was authorized to do business. 5 In return Empire agreed to pay commissions based on the amount of premiums received on insurance applications submitted by Enterprises and accepted by Empire. *306 The pertinent provisions of the contract between Empire and Enterprises are as follows: Associate's Agreement This Agreement, effective on the Agreement Date hereof when signed by the Parties, by and between the Empire Life Insurance Company of America, Little Rock, Arkansas, (herein called the First Party), and Associate (herein called the Second Party), (First Party and Second Party referred to jointly as Parties), is in lieu of any or all prior agreements, either written or oral, between the Parties except that, for the purposes of Paragraph 8 herein regarding renewals on business Previously Effected by Second Party, it shall be deemed effective as of the Previously Effected Renewal Date hereof. 1. This is the entire agreement between the Parties. It may be modified, but only by a writing signed by the Second Party and the President, Vice President or Secretary of the First Party. 2. Nothing contained herein is intended to create the relationship of employer and employee between the Parties. Second Party shall be free to exercise his own judgment as to persons, times, and places of solicitation. * * *6. The Second Party agrees: * * *d. Not to take an application*307 nor deliver a policy to an applicant not in good health and insurable condition at the time of said application or delivery, nor deliver a policy until the first full premium has been fully paid; to deliver all policies within thirty days from the date the policy is mailed from the Home Office of the First Party; failing that, to return same on the day following such thirtieth day. e. To forward to the First Party all of any settlement taken with an application, and when the first premium is paid in cash on delivery of the policy, he will remit the same to the First Party. f. To pay the medical examination fee and cost of inspection when a policy is issued as applied for and is not accepted and paid for by the applicant, or is secured contrary to the First Party's rules. g. To obtain a signed policy receipt upon delivering a policy. * * *k. That the First Party shall have the right to deduct any debt owed it by the Second Party from any monies owed him hereunder, and to apply credits to any such debt at its preference, and that it may charge a 5% per annum interest on any such debt. That the Second Party may not offset any deferred commissions against amounts owing the*308 First Party. * * *7. The Parties mutually agree that: a. If the Second Party shall in the future be guilty of any criminal conduct, the First Party may at its option declare this Agreement and all rights of the Second Party hereunder or to accrue hereunder to be terminated. Also this Agreement may be terminated as to future business by either Party upon giving written notice to the other at the last known address of each. The Second Party's death or his total physical or mental disability as determined by the First Party shall terminate this Agreement except as herein otherwise provided. If the Second Party is a partnership, the death of a member thereof or dissolution of the partnership shall automatically terminate this Agreement. At the termination of this Agreement, immediately any amounts owing from Second Party to the First Party become due and payable and any rights of Second Party hereunder immediately cease and terminate except as herein otherwise provided. b. The First Party must approve any sale, transfer or assignment of this Agreement before it is valid. c. Failure or omission of the First Party to enforce this Agreement or any part thereof when violated*309 by Second Party, or its failure to exercise any of its rights and privileges hereunder, shall not be deemed a waiver thereof. 8. a. For services hereunder, First Party will allow Second Party commission in accordance with schedules attached hereto on premiums paid on policies written by Second Party and Associates assigned to the Second Party less amounts allowed said assigned Associates, and the sureties on any bond furnished by Second Party shall be responsible to the First Party for all monies collected by or passing through the hands of such assigned Associates and for all monies advanced or loaned by First Party to said Associates at the request of or with the approval of the Second Party, or in accordance with the provisions of such Associate's agreements. All commissions or other remuneration earned by Associates assigned to the Second Party shall be paid by the First Party and deducted from commissions payable hereunder to the Second Party. The First Party's determination of commissions payable or other remuneration of whatever nature payable to Associates assigned to the Second Party shall be conclusive and binding upon the Second Party. The employment by the Second Party*310 of a duly appointed National Advisory Board Director of the First Party in the procurement of an application for insurance, constitutes assignment to and acceptance by the Second Party of such National Advisory Board Director as regards such application, within the meaning of this paragraph. For purposes of this Paragraph 8: (1) First year commission shall mean the amount of the first year commission paying premiums to be paid Second Party, calculated according to Schedules attached hereto. (2) Renewal commission shall mean the amount to be paid Second Party calculated according to Schedules attached hereto, on the premiums for the second and subsequent years of a policy. During any contract year Second Party is required to produce $2,000.00 in first year annualized premiums to qualify for that year's renewal commissions. (3) Payment to the widow of Second Party shall mean to the widow or if none survives, or on the widow's death, to the Second Party's legal representative. (4) When any portion of the amount insured by a policy is reinsured, the First Party shall have the right to modify the amount of first year commission to the extent of the reinsurance premium paid or*311 to be paid by the First Party. b. Since renewal commissions are paid for Second Party's sevices in Keeping of insurance in force, to insure the repayment of indebtedness to the First Party and to insure the continuous loyalty and fidelity of Second Party, the First Party will continue to pay renewal commissions as they accrue for so long as this Agreement remains in force. In event of death of Second Party while this Agreement is in force, before retirement, renewal commissions will be paid to the widow until a total of nine renewal commissions have been paid on each policy including those paid prior to death. In event of total and permanent disability of Second Party as determined by the First Party while this Agreement is in force, the First Party will continue to pay renewal commissions as they accrue for so long as Second Party lives. If while totally and permanently disabled as determined by the First Party, Second Party dies, renewal commissions will be paid to the widow until a total of nine renewal commissions have been paid on each policy, including those paid prior to death. * * *e. No commissions will be paid: (1) Unless the insured has certified to the First*312 Party that the policy is as represented and applied for, and (2) Until the premium has actually been received by the First Party at its Home Office. (3) On prepaid, unused premiums, or (4) On interim or short term insurance or on extra premiums charged for occupational hazards or physical impairments, or (5) On any premium in default except where the policy is reinstated by the Second Party, or (6) If, at any time, Second Party endeavors to induce any representative of the First Party to leave its services, or its policyholders to relinquish policies, or (7) After the termination of this Agreement, the annual commission paying premium on insurance in force hereunder is less than $5,000.00, or (8) On business unless the Second Party's name appears upon the application therefor as Associate nor on more than an equal part of the business on applications secured jointly with any Associate or other person acting for the First Party whose name appears on the application with that of the Second Party, unless it is specifically agreed to the contrary in writing by all the interested parties. * * *Pertinent provisions of a schedule which was attached to and formed a part*313 of the "Associate's Agreement" are as follows: This Schedule effective on the Agreement Date hereof when signed by the Parties, by and between the Empire Life Insurance Company of America, Little Rock, Arkansas (herein and therein called the First Party) and the Associate hereof (herein and therein called the Second Party), (First Party and Second Party referred to jointly as Parties), shall be attached to and form a part of an Associate's Agreement herein referred to as the Original Agreement, entered into on the Agreement Date hereof, Witnesseth: Subject to all the provisions of the Original Agreement and/or any modifications thereof and this and any other schedules attached, the Second Party agrees to assume full responsibility under the terms and provisions of their respective Agreements of associates Enterprises was entitled to a commission of 3 percent assigned to the Second Party during the period of such assignment, and for whose fidelity and honesty Second Party shall be responsible to the First Party. Second Party is responsible to and assumes the liability to the First Party for all monies collected by or passing through the hands of such assigned Associates and for*314 all monies advanced or loaned by First Party to said agents at the request of or with the approval of the Second Party or in accordance with the provisions of such Associate's Agreements. Monies advanced to Associates at the time business is written equal to commissions provided by their Agreements to be paid thereon, constitutes monies advanced or loaned by the Company at the request or with the approval of the Second Party. Under the provisions of the contract, Enterprises was to collect the first full premium before the policy was presented for acceptance by Empire. The payment by the proposed insured was a prepaid premium to cover a period of time after the acceptance of the policy by Empire. Such payments would usually be for a one-month, three-month or one-year period. Since under clause 8e(3) of the Associate's Agreement no commission would be paid on prepaid, unused premiums, there was a lag time between the date an agent began to sell insurance on behalf of Empire and the date on which the commissions would be "earned" under the terms of the contract. Due to the lag period before agents were entitled to or had "earned" commissions under their contractual arrangement with*315 Empire, it was the policy of Empire to make advances of money to the agents. 6 Where the agent was new to the insurance business and had no history of production upon which to anticipate the amount of premiums he might generate, Empire might make a flat monthly advance to the agent. During the years here in issue it was the practice of Empire to make advances to agents with experience based upon a percentage of newly submitted business, with the understanding that the balances would be reduced as the commission became earned under the terms of the Associate's Agreement. This was the arrangement of Empire with Enterprises and during the years here in issue the advances of Empire to Enterprises were based upon the volume of new business written by Enterprises for Empire. The amount of the advance was the commission which would be earned by Enterprises on premiums on this new business if the policy remained in force for the full term for which the initial premium was paid. *316 Empire, after making advances to Enterprises would establish a "debt account" reflecting the amount of advances made. Once the premiums had been earned by the policy remaining in effect for the premium period, Empire would credit the "debt account" by the amount of commissions to which Enterprises was entitled. The advances would be repaid in full by the crediting of the amount of earned commission against the "debt account" if the policy remained in effect for the first full premium period. However, if the policyholder were to cancel his policy before the premium had become fully earned, he would receive a refund of a portion of the premium and the agent's commission was proportionately reduced. When this would occur, the agent would have been advanced a greater sum of money than he was entitled to receive as a commission under the contract with Empire. Under the terms of the contract with Empire, Enterprises was entitled to a commission based on the first year's premium. In addition Enterprises was entitled to a renewal commission of a lesser percentage of the subsequent year's premiums for each year that the policy remained in force. For example, under the terms of the contract, *317 Enterprises was entitled to a commission of 90 percent of the first year's premium on whole life insurance. Thereafter, Enterprises was entitled to a commission of 9 percent of the premium for each additional year the policy remained in force for a total of 9 renewal years. After this period, if the policy were still in force, Enterprises was entitled to a commission of 3 percent of the premium for each year the policy remained in force. When Empire made advances to agents, it was generally understood that Empire would not assert any personal liability for repayment on the part of the agent, other than through the crediting of commissions as they became earned under the terms of the "Associate's Agreement." It was the practice of Empire not to make an advance unless it fully expected that the commission to become earned under the terms of the "Associate's Agreement" would be sufficient to repay the advance. Enterprises received advances during the taxable years in issue. Enterprises had full control over the sums received by these advances and could use the sums in any manner it saw fit. The following advances were made to Enterprises by Empire during the years in issue: Earned Taxable YearAdvanceCommissionJune 30, 1967$104,681.66$ 79,451.07June 30, 1968153,830.2294,042.84June 30, 197094,094.6383,812.00*318 On its corporate income tax returns filed for the years in issue, Enterprises reported as commission income from its agency agreement with Empire only the amounts of the above set forth "earned commissions." 7 Enterprises has continued to follow this method of reporting in years subsequent to the years here in issue by including in its income the amount of earned commissions credited to its account by Empire although the amounts credited are not actually received by Enterprises. Enterprises' agreement with Empire was terminated at some time during the course of the fiscal year ended 1970. At the time of the trial of this case, Empire had not attempted to collect any funds to reduce Enterprises' debit balance in the "debt account" other than through the crediting of commissions as they became earned under the terms of the "Associate's*319 Agreement." The balance in the account has been gradually reduced by renewal commissions that have been credited against the account. Since the termination of its contract with Empire, Enterprises had made no payments against the "debt" account other than through the crediting by Empire of renewal commissions against the account. No promissory note has ever been executed nor has any collateral been provided with respect to Enterprises' "debt account" on Empire's books. Although the "Associate's Agreement" permitted interest to be charged by Empire on any "debt" owed it by Enterprises, no interest has been charged to the account. At the present time no repayment schedule has been entered into between the parties other than a continued reduction through the crediting of renewal commissions. From the date of its incorporation in June of 1966, Enterprises has had as its only shareholder Mr. Blood, who was also president of the corporation. As president of the company he received a salary and an expense account allowance. During the years in issue he received the following amounts: Fiscal YearExpense EndingCompensationAccountJune 30, 1967$ 26,673.29$ 11,889.88June 30, 196821,580.0019,619.00June 30, 19697,500.0027,012.00June 30, 19706,800.000.00June 30, 19712,460.002,388.00June 30, 19720.005,810.00*320 In addition to his salary and expense account allowance, Mr. Blood received sums from Enterprises by direct payment to him or by payments made for his benefit by the corporation. These payments made by Enterprises to or for the benefit of Mr. Blood were in the following net amounts for the years indicated: YearAmounts1967$30,049.77196813,523.7819696,399.94197010,840.00A portion of these payments was used by Mr. Blood to acquire a lake house and some duplex houses which were in the name of Mr. Blood and his wife personally. No mortgage on the properties was given to Enterprises. When the lake house was sold, no part of the proceeds of the sale was used to repay the amounts previously paid by Enterprises to or for Mr. Blood. The payments made to or for the benefit of Mr. Blood by Enterprises were reflected on the corporate books as "loans to stockholders." The account as shown on the books for the years in issue reflected the following net balances at the end of the taxable year: 8 Loans to StockholdersAccount Balance7-1-66$ 0.00Fiscal Year Ending 6-30-6720,237.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,573.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,479.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,319.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,073.00*321 The proceeds of the advances made by Enterprises directly to Mr. Blood were used by Mr. Blood as he saw fit. No promissory note was given by Mr. Blood to Enterprises with respect to the amounts advanced and no interest has been charged by the corporation on these advances nor has any interest been paid thereon by Mr. Blood. Each of the sums advanced was unsecured and no repayment schedule has ever been established. Enterprises has never declared or paid a formal dividend. On the Blood's personal income tax return for 1968, *322 they included in claimed deductions for Mr. Blood's business expenses the following expenditures made with respect to a lake house and boat: ItemAmountFinance Charge on Boat$ 11.00Real Estate Taxes102.00Interest251.00Insurance96.00Utilities19.00Miscellaneous22.00Total$501.00The $11 finance charge was paid in 1968 by Mr. Blood in connection with a loan on his boat and the $102 of real estate taxes were paid by him in 1968 on the lake house. In 1968 Mr. Blood paid $251 interest on a mortgage on the lake house. On the Blood's personal income tax return for 1968 they also included in Mr. Blood's claimed deduction for business expenses the following: ItemAmountOffice Expense$ 80.00Lodging71.00Entertainment and Meals183.00Aviation Fuels28.00Miscellaneous27.00Total$389.00During 1968 Mr. Blood spent $80 for items such as stamps, pencils and stationery which he used in his business of soliciting insurance sales and for which he received no reimbursement from Enterprises. On the Blood's 1969 personal income tax return they included deductions claimed as Mr. Blood's business expenses the following: *323 ItemAmountFood and Entertainment$ 592.00Motel223.00Travel59.00Office Expenses59.00Pilot Service180.00Airplane Expense181.00Miscellaneous261.00Meals, Incidentals, etc.while away from homeovernight--240 days at $10 per day2,400.00Total$3,955.00In 1969 Mr. Blood spent $59 for office supplies such as stamps, pencils and stationery which he used in his business of soliciting insurance sales and for which he was not reimbursed by Enterprises. On petitioners' personal income tax return for 1970 they claimed a deduction for an employee business expense in the amount of $1,600 described as follows: "Meals, incidentals, entertainment, etc, away from home - 160 days at $10 day." In his notice of deficiency to Enterprises for its taxable year ended June 30, 1970, respondent increased reported gross income by $10,282.63 with the explanation that "[it] is determined that the corporation received advances from insurance companies. These advances exceeded the earned commissions by $10,282.63 for the year ended 6-30-70. These amounts are includable in taxable income because the use of the money was free and unrestricted and there*324 was no obligation to repay." Respondent also increased Enterprises' reported income for the taxable years ending June 30, 1967 and 1968 with the following explanation: "It is determined that during the years ended June 30, 1967 and June 30, 1968 you received commissions from Empire Life Insurance Company in excess of earned premiums in the respective amounts of $25,230.59 and $59,787.38. It is further determined you had unrestricted use of these commissions and they constitute payments for services rendered. Accordingly your taxable income for the years ended June 30, 1967 and June 30, 1968 is increased in the respective amounts of $25,230.59 and $59,787.38." In his notice of deficiency to George and Jo Ann Blood for the year 1967, respondent increased reported gross income with the following explanation: "During the year 1967, George Blood Enterprises, Inc. made certain payments to you or for your benefit. It is determined that such payments, which total $30,049.77, constitute dividend income under sections 301 and 316 of the Internal Revenue Code of 1954 and are includable in your income. Therefore, your taxable income is increased $30,049.77." In his notice of deficiency to*325 petitioners George and Jo Ann Blood for 1968, 1969 and 1970, respondent increased their reported income in the amounts of $13,523.78, $6,399.94 and $10,840.00, respectively, with the explanation that "[it] is determined that you received a dividend when your wholly owned corporation George Blood Enterprises, paid your personal expenses and charged the amounts to 'Accounts Receivable--George Blood' on its books of account. * * * These increases in Accounts Receivable and other payments made on your behalf or to you by George Blood Enterprises, Inc. constitute a taxable dividend to you, and are includable in your gross income in accordance with section 61 of the Internal Revenue Code." In his notice of deficiency to Mr. and Mrs. Blood respondent disallowed the claim employee business expenses of Mr. Blood for 1968, 1969 and 1970 as set forth above because "[it] has not been established that any of these amounts constitute an ordinary and necessary business expense or were expended for the purpose designated." OPINION Section 61 and Section 1.61-2, Income Tax Regs., 9 provide that gross income means all income from whatever source derived and that commissions*326 received are to be included in determining the gross income of a taxpayer. It is Enterprises' position that the monies received from Empire as advances prior to the time that the commissions became earned under the terms of its contractual agreement*327 with Empire were not compensation when received, but loans made to it by Empire. Enterprises contends that these "loans" did not become income until such time as it became entitled to "earned commissions" upon the expiration of the premium period with the policy still in force. Enterprises maintains that when the advances were made it had a definite obligation to repay the sums advanced and therefore the advances were loans despite the lack of indices of a debtor-creditor relationship. It is respondent's position that the advances received by Enterprises from Empire were not loans since there was no definite obligation of repayment when the advances were made. Respondent contends that these advances constitute income when received. Advances of commissions to a taxpayer under an agreement that places no personal liability of repayment on him but provides that any excess of the advances over commissions earned are to be recovered by the payor only by crediting earned commission against the advances constitute income to the recipient when the advances are received. L. L. Moorman,26 T.C. 666, 674 (1956); Kenneth Drummond,43 B.T.A. 529, 532-533 (1941).*328 Such advances of commissions are nothing more than advance salary or other payment for services which is includable in income by a taxpayer when received. Anson Beaver,55 T.C. 85, 90 (1970). However if there is an unconditional personal obligation of a taxpayer to repay an amount advanced to him, the advance may be a loan which would not be includable in income since the concept of income excludes loans which must unconditionally be repaid. James v. United States,366 U.S. 213, 219 (1961). Whether an advance is income or is a loan is a question of fact to be determined from a consideration of all the circumstances surrounding the making of the advances. Anson Beaver,supra at 91; New England Tank Industries, Inc.,50 T.C. 771, 777 (1968). From an examination of all facts and circumstances in this case, we conclude that Enterprises has failed to show that it had an unconditional obligation to repay the advances made to it by Empire. Therefore, we conclude that the advances constituted income to Enterprises when the advances were received by it from Empire and not when the commissions which reduced the account*329 for the advances were "earned" under the terms of the "Associate's Agreement." The provisions of the contract are not entirely clear, 10 but the actions of Empire and Enterprises with respect to the advances are evidence of the fact that at the time the advances were made there was no unconditional obligation of Enterprises to repay the amounts advanced prior to the date the commissions were "earned" under the terms of the contract. *330 The reason that the advances were made was to prevent a lag time from the date an individual began selling insurance for the company and the date that the commission on the premium would become earned. It was the intention of the parties when such advances were made that the commissions to which the agent was entitled as long as the policy was in force would be sufficient to equal the balances advanced over a period of time. No advance would have been made without this intent. Also, it was the understanding of the parties that Empire would not assert any personal liability on the part of the agent for repayment of advances such as those made to Enterprises other than through the crediting against the advances the commissions which became earned under the terms of the "Associate's Agreement." The action of the parties with respect to the advances supports their intent. At the time of the trial, Empire had not attempted to reduce the outstanding balance in Enterprises' "debt account" other than through the crediting of renewal commissions against the account as those commissions became earned under the terms of the contract. 11 No repayment schedule was reached when after the latter*331 part of 1969 Enterprises no longer could solicit new policies for Empire. After 1969 only renewal commissions were available to reduce the outstanding balance of the account, but no promissory note was requested by Empire or executed by Enterprises with respect to the account and no collateral has been given by Enterprises to secure payment. The facts here show that Enterprises had at most a contingent liability to repay the advances at the time the advances were received. The payment was to be made only if commissions generated by Enterprises were available to repay the advances under Empire's policy of recovering the amounts of the advances only through the crediting against such advances earned and renewal commissions. Also any amount that might have to be repaid was indeterminate when the sums were advanced. The only situation*332 in which the account would not "balance" after the first anniversary date of the policy would be if the policy were canceled at some time during the course of the year. An examination of all facts of record indicates that there was no obligation of Enterprises to pay a sum certain at any fixed or other maturity date. An advance once received was used by Enterprises in its sole discretion. In our view the advances by Empire to Enterprises were not loans. Enterprises contends that if we conclude that the advances were not loans, these advances nevertheless should not be considered as income because there is a possibility that the commissions would have to be refunded to the insurance company if the policies were to be canceled by the policyholder. This contention is without merit. Commissions are taken into income when received even though there is a possibility that some portion of the amount might have to be refunded to the insurance company if the policy is canceled. Van Wagoner v. United States,368 F. 2d 95 (5th Cir. 1966). This conclusion is consistent with numerous cases holding that amounts received under a claim of right are includable in income when received*333 even though at some later date some of the amounts may have to be refunded. See North American Oil Consolidated v. Burnet,286 U.S. 417 (1932). We conclude that respondent properly increased Enterprises' reported income for the taxable years ending June 30, 1967, 1968 and 1970 by the amounts of $25,230.59, $59,787.48 and $10,282.63, respectively, as additional commissions received. Under section 301, 12 corporate distributions to shareholders which are dividends as defined in section 316 are includable in the shareholder's income. A dividend as defined by section 316(a)13 is any distribution of property made by a corporation to its shareholders out of current or accumulated earnings and profits. *334 The record here shows that Enterprises in the years 1967, 1968, 1969 and 1970 paid net amounts of $30,049.77, $13,523.78, $6,399.94 and $10,840.00, respectively, to or for the benefit of Mr. Blood, its sole stockholder. Mr. Blood contends that these payments constitute loans made by Enterprises to him rather than dividends as determined by respondent. 14Whether the payments to or on behalf of Mr. Blood by Enterprises constituted proceeds of a loan or whether such amounts are dividends depends on the intent of the parties*335 at the time the payments were made. This intent is to be determined from all the facts and circumstances surrounding the transaction. Chism's Estate v. Commissioner,322 F. 2d 956, 960 (9th Cir. 1963), affirming a Memorandum Opinion of this Court; Walter K. Dean,57 T.C. 32, 43 (1971), and cases there cited. When the payment by the corporation is to the shareholder in control of the corporation, "such control invites a special scrutiny of the situation." Jack Haber,52 T.C. 255, 266 (1969), affd. per curiam 422 F. 2d 198 (5th Cir. 1970). George Blood Enterprises, Inc. was incorporated in June of 1966. From the date of incorporation, Mr. Blood has been the sole shareholder and president of the corporation. Enterprises has never declared or paid any formal dividend to its shareholder. Mr. Blood points to two factors which he claims demonstrate that the payments made to him or on his behalf were loans. The first such factor is that the amounts of the payments were reflected in an account designated "loans to shareholders" on the corporate books of Enterprises and the second is that he made repayments to Enterprises on*336 this account. It is well established that no one factor is dispositive of the issue of whether advances by a corporation to its shareholders are loans or dividends and that bookkeeping entries, although of evidential value, are not controlling. Elliott J. Roschuni,29 T.C. 1193, 1203 (1958), affd. per curiam, 271 F. 2d 267 (5th Cir. 1959), cert. denied 362 U.S. 988 (1960); Walker K. Dean, supra.The record here shows that during the years in issue the payments by Enterprises to or on behalf of Mr. Blood were consistently treated as loans on the corporate books. However, the assertion by Mr. Blood that substantial repayments were made is not supported by the evidence of record. The net amounts of the payments made to or on behalf of Mr. Blood for the years in issue were stipulated by the parties. The amounts represent the net changes in the outstanding balances in the "loans to shareholders" account on the books of Enterprises from the end of one fiscal year to the end of the succeeding fiscal year. During the years in issue the amounts steadily increased. If repayments were made, there is no evidence to so show aside*337 from Mr. Blood's testimony. 15 If we accept this testimony as proof that some repayments were made, there is no evidence as to the regularity of repayments or whether the repayments were substantial in amount as compared to the outstanding balance of the account. There are a number of factors shown by*338 the evidence which are indicative of no firm intention of Mr. Blood to establish a debtor-creditor relationship between Enterprises and himself. There was no promissory note executed or other evidence of indebtedness given by Mr. Blood to Enterprises. No interest rate was established on the payments and no interest has been paid. No repayment schedule was ever agreed upon. No corporate resolution approving the payments was introduced in evidence and there is no basis to conclude that such a resolution exists. A portion of the withdrawals were invested by Mr. Blood in a lake house and certain duplex homes, titles to which were taken in the name of Mr. Blood and his wife. At the time of these withdrawals, no second mortgage was offered to Enterprises as security for the payments. At a later time when the lake house was sold, none of those proceeds of the sale over the indebtedness on the property sold was used by Mr. Blood to repay Enterprises. After considering all factors present in this case, we conclude that the payments made by Enterprises to or on behalf of Mr. Blood of $30,049.77, $13,523.78, $6,399.94 and $10,840 in the years 1967, 1968, 1969 and 1970, respectively, constituted*339 dividends in the year the payments were made. Petitioner has cited a number of cases such as Joseph Miele,56 T.C. 556 (1971), affd. on another issue 474 F. 2d 1338 (3d Cir. 1973), and Victor Shaken,21 T.C. 785 (1954), holding payments by a corporation to or on behalf of a shareholder to be loans. However in each of those cases the evidence showed facts not here shown to indicate the intent of the parties that the advances were loans. In none of those cases did we rely solely on the accounting treatment of the payments on the corporation's books, which is the only factor shown in the instant case to support Mr. Blood's position. On brief Mr. Blood has conceded that the $71 deduction taken for lodging and the $183 deduction for entertainment and meals in 1968 were properly disallowed by respondent. He also has conceded that the $592 deduction for food and entertainment, the $223 deduction for motel, and the $59 deduction for travel taken in 1969 were properly disallowed by respondent. Mr. Blood has conceded that the $1,600 deduction taken for meals, incidentals and entertainment incurred while away from home in 1970 was properly disallowed*340 by respondent. The record with respect to the deductions which remain in dispute is sketchy. At the time the deductions were taken, Mr. Blood claimed that the lake house and boat constituted an entertainment facility used in the furtherance of his business. Mr. Blood has offered no evidence to substantiate that his deductions for the lake house and boat constituted business expenses and apparently has conceded that the facilities were not used in furtherance of his business. The fact that the expenses on the lake house and boat are not deductible as business expenses does not prevent certain items from being properly deductible under other Code sections. Since Mr. Blood computed his taxes on the basis of itemized nonbusiness deductions, he is entitled under section 163 to deduct in 1968 the $11 finance charge incurred with respect to the boat and the $251 of interest paid on a loan on the lake house. He is entitled in 1968 to deduct the property taxes of $102 paid on the lake house under section 164. The claimed deductions $96of for insurance, $19 for utilities and $22 as miscellaneous expense are nondeductible personal expenses. From the evidence in the record we conclude that*341 Mr. Blood in 1968 expended $80 and in 1969 expended $59 for office supplies for which he was not reimbursed and that respondent improperly disallowed these claimed deductions. It appears that these expenditures were for supplies he used in making insurance sales. While the record is not clear on this point, it is sufficient to support the conclusion that these expenses were his expenses as an insurance salesman and not expenses of Enterprises which he paid and for which he should have received reimbursement. We, therefore, hold that Mr. Blood is entitled to deduct the $80 spent in 1968 and the $59 spent in 1969 for office supplies as business expenses. There is no evidence in the record to show that the $28 claimed as a deduction for aviation fuel was actually spent, and if it were spent, that it is properly deductible by Mr. Blood. If the $28 were spent for aviation fuel, it could have been in connection with travel away from home. Mr. Blood was away from home a substantial amount of time in the conduct of Enterprises' business. Travel expenses incurred while away from home 16 as well as entertainment expense must meet the substantiation requirements of section 274(d) and section*342 1.274-5, Income Tax Regs.17 Mr. Blood has failed to produce the evidence required to substantiate his claimed travel and entertainment expenses which were disallowed by respondent in accordance with the requirements of section 274. Mr. Blood failed to substantiate the claimed deductions for miscellaneous expenses in any manner. Therefore, other than as heretofore set forth, we sustain respondent's disallowance of all the claimed business expense deductions of Mr. Blood which are still in controversy. *343 The Bloods have conceded that they are not entitled to the claimed 1970 business expense deduction of Mr. Blood which remained at issue at the time of the trial. Decisions will be entered under Rule 155.Footnotes1. All statutory references are to the Internal Revenue Code of 1954, as amended.↩2. The parties have stipulated that the addition to tax imposed under sec. 6651(a)(1)↩ is applicable to any deficiency as finally determined as follows: That a 25% addition to tax is applicable to any deficiency as finally determined for 1967 and 1970, and that a 5% addition to tax is applicable to any deficiency as finally determined for 1969.3. The parties have stipulated that the addition to tax imposed under sec. 6651(a)(1)↩ is applicable in the amount of 25% of any deficiency as finally determined for the taxable years ended June 30, 1967 and June 30, 1970.4. The parties have stipulated that Mr. Blood is the sole shareholder of Enterprises. The corporate income tax return filed for Enterprises for fiscal year ended June 30, 1967 lists the common stock as being jointly held by Mr. and Mrs. Blood. This discrepancy is not material to the issues before us.↩5. On June 1, 1967, Enterprises entered into the same contractual arrangement with Empire authorizing it to act as agent in the territory composed of the State of Florida. On September 1, 1966, the same agreement was entered into for the territory of the State of Illinois.↩6. For example, if an agent were to write an insurance policy which provided for an annual premium he would collect the premium and submit it along with the application to Empire for approval. Under the terms of the contract, the agent would be entitled to some portion of the first annual premium as his commission. Therefore upon presentation of the application with the pre-paid annual premium, petitioner would get an amount equal to his commission several days after approval of the application by Empire. Each agent received a monthly status report reflecting his transactions with the company. Where an agent sold a policy that provided for the payment of monthly premiums he would collect the first month's premium prior to presentation and acceptance by Empire. At that time Empire would advance a percentage of the agent's commission which is a percentage of the first annual premium on the policy. For example, if an agent sold an insurance policy with an annual premium of $1,200 payable $100 per month and his commission was 100 percent of the first annual premium the company would advance the agent 75 percent of his commission or $900 upon the payment of the first monthly premium. Thereafter as each monthly premium was received by the company his outstanding account would be reduced by the amount of the premium. Thereafter if the policy remained in force nine months the account would be even and the agent would receive the following three-months' commission as the payments were received. The company does not consider the commissions earned until the policy has been in force for a premium period because of the possibility of cancellation before the policy has remained in force for one year.↩7. At some point during the latter part of 1969 the contract Enterprises had with Empire was terminated. Empire was in financial trouble and local authorities would not allow it to accept new business, so that in effect Enterprises no longer had a product to sell for Empire. Empire has remained in business to protect outstanding policyholder interests.↩8. Petitioner has maintained that over the years in issue amounts were from time to time repaid to reduce the balance of the account. However, in each year the outstanding balance at the end of the fiscal year was larger than the ending balance of the prior year. The only repayment shown in the record was the repayment of $2,700 by Mr. Blood to Enterprises upon the sale of an automobile in 1971 owned by Mr. Blood. In the taxable year ending June 30, 1972, the ending balance in the account was $53,760.40, a reduction of $9,312.60 from the ending balance of the previous year which indicates that some portion of the outstanding balance may have been repaid.↩9. SEC. 61. GROSS INCOME DEFINED. (a) General Definition.--Except as otherwise provided in this subtitle, gross income means all income from whatever source derived, including (but not limited to) the following items: (1) Compensation for services, including fees, commissions, and similar items; * * * Sec. 1.61-2 [Income Tax Regs.] Compensation for services, including fees, commissions, and similar items. (a) In general. (1) Wages, salaries, commissions paid salesmen, compensation for services on the basis of a percentage of profits, commissions on insurance premiums, tips, bonuses (including Christmas bonuses), termination or severance pay, rewards, jury fees, marriage fees and other contributions received by a clergyman for services, pay of persons in the military or naval forces of the United States, retired pay of employees, pensions, and retirement allowances are income to the recipients unless excluded by law. * * *↩10. Enterprises has relied on clause 6 k of the "Associate's Agreement" to buttress its argument that the advances were loans. However the clause states only that Empire has the right to satisfy any debt owed it by crediting amounts against that debt that would otherwise be owed to agents and that there is the right to charge interest. We note that in one of the supplemental schedules signed by the parties one of the provisions stated in part: Second Party is responsible to and assumes the liability to the First Party for all monies collected by or passing through the hands of such assigned Associates and for all monies advanced or loaned by First Party to said agents at the request of or with the approval of the Second Party or in accordance with the provisions of such Associate's Agreements. Monies advanced to Associates at the time business is written equal to commissions provided by their Agreements to be paid thereon, constitutes monies advanced or loaned by the Company at the request or with the approval of the Second Party. [Emphasis supplied.] In our view the language "advanced or loaned" does not establish that in each case the sums advanced are loans in any formal sense. No provisions in the contract attempt to set out any procedure for securing the "loans" or to provide any repayment schedule for sums advanced that are not reduced completely through earned premium commissions or renewal commissions. The parties stipulated that: "When Empire made advances to agents, it was generally understood that Empire would not assert any personal liability for repayment on the part of the agent, other than through the crediting of commissions as they became earned under the terms of the associate's agreements. * * *"↩11. This method of reduction of the balances is consistent with the customary practice of Empire with respect to advances made by the company to other agents. A former executive vice-president of Empire, who was with the company during a portion of the time that George Blood or George Blood Enterprises, Inc. was associated with that company, so testified.↩12. SEC. 301. DISTRIBUTIONS OF PROPERTY. (a) In General.--Except as otherwise provided in this chapter, a distribution of property (as defined in section 317 (a)) made by a corporation to a shareholder with respect to its stock shall be treated in the manner provided in subsection (c). * * *(c) Amount Taxable.--In the case of a distribution to which subsection (a) applies-- (1) Amount constituting dividend.--That portion of the distribution which is a dividend (as defined in section 316) shall be included in gross income. * * *↩13. SEC. 316. DIVIDEND DEFINED. (a) General Rule.--For purposes of this subtitle, the term "dividend" means any distribution of property made by a corporation to its shareholders-- (1) out of its earnings and profits accumulated after February 28, 1913, or (2) out of its earnings and profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of the earnings and profits at the time the distribution was made. Except as otherwise provided in this subtitle, every distribution is made out of earnings and profits to the extent thereof, and from the most recently accumulated earnings and profits. To the extent that any distribution is, under any provision of this subchapter, treated as a distribution of property to which section 301↩ applies, such distribution shall be treated as a distribution of property for purposes of this subsection.14. It is the position of respondent that if we were to decide in his favor on the first issue (as we have done) that there were sufficient earnings and profits in Enterprises for the entire amount to constitute dividends, rather than a portion being dividend, a portion constituting a return of basis and the additional amounts once the basis has been reduced to zero constituting capital gain income. Mr. Blood has not argued otherwise. His only argument in this regard is that if we find in his favor on the first issue, there would not be sufficient earnings of Enterprises for the payments made by Enterprises to him or on his behalf to be considered dividends.↩15. Petitioner testified that occasionally he received brokerage fees in his individual capacity and that those amounts were placed in the corporation and credited against the balance of the account with the corporation. However, there is no indication of the amount of those fees, the regularity of repayment, or in what year those sums were transferred to Enterprises. The only specific instance of repayment occurred during 1971 when petitioner sold an automobile and $2,700 of the proceeds were transferred to the corporation as a repayment on the account. The account increased every year in issue. The only decrease occurred in Enterprises' fiscal year ending in Mr. Blood's 1972 taxable year. At that time the statutory notice of deficiency for 1967 in which the respondent asserted that payments made to or on behalf of Mr. Blood were dividends rather than loans had been issued.↩16. See United States v. Correll,389 U.S. 299↩ (1967), for definition of "away from home." 17. SEC. 274. DISALLOWANCE OF CERTAIN ENTERTAINMENT, ETC., EXPENSES. (d) Substantiation Required.--No deduction shall be allowed-- (1) under section 162 or 212 for any traveling expense (including meals and lodging while away from home), (2) for any item with respect to an activity which is of a type generally considered to constitute entertainment, amusement, or recreation, or with respect to a facility used in connection with such an activity, or (3) for any expense for gifts, unless the taxpayer substantiates by adequate records or by sufficient evidence corroborating his own statement (A) the amount of such expense or other item, (B) the time and place of the travel, entertainment, amusement, recreation, or use of the facility, or the date and description of the gift, (C) the business purpose of the expense or other item, and (D) the business relationship to the taxpayer of persons entertained, using the facility, or receiving the gift. The Secretary or his delegate may by regulations provide that some or all of the requirements of the preceding sentence shall not apply in the case of an expense which does not exceed an amount prescribed pursuant to such regulations. Sec. 1.274-5. [Income Tax Regs.] Substantiation requirements. (a) In general. No deduction shall be allowed for any expenditure with respect to-- (1) Traveling away from home (including meals and lodging) deductible under section 162 or 212. * * *(b) Elements of an expenditure-- * * *(2) Travel. The elements to be proved with respect to an expenditure for travel are-- (i) Amount. Amount of each separate expenditure for traveling away from home, such as cost of transportation or lodging, except that the daily cost of the traveler's own breakfast, lunch, and dinner and of expenditures incidental to such travel may be aggregated, if set forth in reasonable categories, such as for meals, for gasoline and oil, and for taxi fares; (ii) Time. Dates of departure and return for each trip away from home, and number of days away from home spent on business; (iii) Place. Destinations or locality of travel, described by name of city or town or other similar designation; and (iv) Business purpose. Business reason for travel or nature of the business benefit derived or expected to be derived as a result of travel.↩