WALTER K. DEAN AND LAURIN D. DEAN, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1323–68. Filed October 6, 1971.

*Hugh R. Dowling, Patrick G. Emmanuel,* and *Michael W. Fisher,* for the petitioners.

*Vernon J. Owens,* for the respondent.

BRUCE, *Judge:* Respondent determined deficiencies in the income taxes of petitioners for the years and in the amounts as follows:

| Year | Deficiency |
|------|-----------|
| 1962 | $14, 005. 34 |
| 1963 | 11, 286. 70 |
| 1964 | 183, 940. 00 |

Concessions have been made by both parties and the issues remaining for decision are: (1) Did petitioners receive a dividend distribution as the result of the transfer of certain sewer facilities by Warrington Home Builders during 1964? (2) Did advances made to Walter K. Dean constitute taxable dividends to the petitioners during the years 1962 and 1963 in the amounts of $16,085.10 and $1,014.21, respectively? (3) Should claimed interest expense on the alleged indebtedness of Walter K. Dean to Warrington Home Builders, Inc., in the amounts of $6,343.35 and $6,588 in 1963 and 1964 respectively, be allowed as deductions?

If the answer to number (1) above is in the affirmative, petitioner further contends that the sewer facilities transferred had no fair market value on the date of transfer, with the result that the value of the dividend would be zero.

### STATEMENT OF FACTS

The stipulation of facts and the exhibits attached thereto are incorporated herein by reference.

The petitioners, Walter K. Dean (hereinafter referred to as Dean) and Laurin D. Dean (also known as Dale T. Dean), are husband and wife. Their legal residence as of the date the petition herein was

filed was Pensacola, Fla. Petitioners timely filed joint income tax returns for the years in question with the district director of internal revenue at Jacksonville, Fla.

Warrington Home Builders, Inc. (hereinafter referred to as Warrington), was incorporated under the laws of Florida on September 8, 1948. During the years 1962, 1963, and 1964, all of the outstanding stock of Warrington was owned by Dean.

Warrington is engaged in the business of buying unimproved land in the Pensacola–Fort Walton Beach area of Florida, building houses thereon, and selling them in the open market. In the building of such houses, Warrington depended upon the use of Federal Housing Administration (FHA) insurance and Veterans' Administration (VA) guarantees for its financing. The improvements put on the land by Warrington consisted of the installation of the streets, curbs, utilities (including water and sewer facilities), and the houses.

In order to secure FHA or VA financing it was necessary that the houses be constructed in accordance with FHA standards, which required (among other things) that the houses be serviced by adequate water and sewer facilities. The FHA would not approve sewer and water plans that had not previously been approved by the Florida State Board of Health.

During the mid-1950's Warrington began developing a subdivision called Garnier Beach in Okaloosa County near the city of Fort Walton Beach, Fla. Around the same time Warrington acquired several hundred acres of raw land near the city of Pensacola in Escambia County, to develop a subdivision called Mayfair.

At that time there were no county-wide sewer or water systems in either Okaloosa or Escambia County to serve the homes being built. Because of this, Warrington developed approximately the first 150 homes in the Mayfair and Garnier Beach subdivisions with septic tanks. After that the FHA and the Florida State Board of Health stopped Warrington from building houses with septic tanks for sewerage disposal because of the health hazard they created.

In 1957, Warrington contracted with a nearby private utility, Pen Haven Sanitation Co. (Pen Haven) whereby Pen Haven would allow Warrington the use of its sewer facilities for the Mayfair subdivision provided Warrington would put in sewerlines and turn them over to Pen Haven free of charge, and pay Pen Haven a fee of $100 per house connected to the plant. After approximately 150 houses were connected to Pen Haven's system, the Florida State Board of Health stopped Pen Haven from taking on any more homes unless it expanded the system. As a result, Warrington was compelled to discontinue use of Pen Haven facilities for any more building.

After efforts to procure adequate sewer facilities for the homes from private utility companies proved fruitless, Warrington constructed its own sewer system to accommodate the remainder of the homes to be constructed at Mayfair and at Garnier Beach. It built sewerage disposal plants in both areas to service only those homes to be built by Warrington. Warrington did not furnish sewer service to any other party.

The FHA requires that legal title to the water or sewer systems be transferred to a trustee to insure performance of the duty of the owner to supply services to lot customers. Pursuant to this requirement, the legal title to each of the sewer systems in question was transferred to an FHA-approved trustee, by trust deeds to Florida National Bank of Jacksonville.

May First Corp. (hereinafter referred to as May First) was incorporated under the laws of the State of Florida on May 9, 1958. It was incorporated for the purpose of acquiring some 300 acres of land known as the Wedgewood subdivision (hereinafter referred to as Wedgewood) for development outside the city of Pensacola.

No sewer or water facilities were available in that area when May First acquired this land. Because May First's development and financing depended on FHA and VA approval, it was necessary to supply water and sewer facilities for the development.

Florida Utility Co. (hereinafter referred to as Florida Utility) was established for the purpose of providing water and sewer service for lots that were to be developed in Wedgewood. Florida Utility was organized under the laws of the State of Florida in October of 1963 and was granted a water and sewer franchise by the Escambia County Board of County Commissioners for the Wedgewood area.

From the date of Florida Utility's incorporation and during all of the calendar year 1964, all of its stock was owned by May First.

During the calendar years 1962, 1963, and 1964 all of the stock of May First was held by the following individuals in the following capacities and in the following amounts:

| Shareholder | Number of shares |
| --- | --- |
| Charles B. Webb, Jr. | 25 |
| Dale T. (Laurin) Dean | 12½ |
| Dale T. (Laurin) Dean, trustee for John Fleming Dean Trust | 12½ |
| Total | 50 |

Dean has never been a stockholder, officer, or director of May First or Florida Utility. Charles B. Webb, Jr., was the son-in-law of the petitioners during the period from before January 1, 1962, to October 1966. John Fleming Dean is the son of the petitioners. Dean loaned his

wife money with which to purchase her stock in May First. May First never developed the Wedgewood subdivision, as originally planned.

The sewer systems built by Warrington to service the houses in Mayfair and Garnier Beach proved to be a liability to Warrington in several ways. They required continuous maintenance and repair and there was always the threat of pollution caused by the systems, and the adverse publicity resulting therefrom. In addition, because these systems were encumbered by trust deeds, the ability of Warrington to borrow funds could be impaired.

Florida Utility, through its president, Charles B. Webb, Jr., approached Warrington offering to operate the sewer facilities owned by Warrington. On March 23, 1964, Warrington transferred part of its sewer facilities at Garnier Beach and part of its facilities at Mayfair to Florida Utility in return for Florida Utility's maintenance of the sewer system and providing sewer service for the houses in the area serviced in accordance with the Florida State Board of Health's rules and regulations. As part of the agreement it was provided that Warrington would install and construct at its cost all future sewer facilities constructed within the confines of both the Garnier Beach subdivision in Okaloosa County and the Mayfair subdivision in Escambia County and transfer them to Florida Utility. Between March 23, 1964, and February 1966, additions to the plant and sewerage collection system at Garnier Beach cost Florida Utility $29,653.

In July of 1964, the Board of County Commissioners for Okaloosa County contracted with an engineering firm, Poly Engineering of Florida, Inc. (hereinafter referred to as Poly Engineering), to make a study to determine whether it was financially feasible for Okaloosa County to set up a central water and sewer system in the Garnier Beach area. The reason for the feasibility study was to determine if a central system could be constructed by the county. The Board of County Commissioners was interested in such a system because it had been advised that the area was in danger of an epidemic of sickness due to septic tanks and inadequate private systems and also because the board felt that the county should have an integrated water and sewer system for the entire county population.

Poly Engineering performed the study for the county. In doing so it studied all the private utility systems then in existence in Okaloosa County, including the Garnier Beach facility of Florida Utility. In arriving at the cost of Florida Utility's facility, Poly Engineering relied mainly on the estimate of replacement cost of the system furnished to it by Florida Utility's engineer. The study estimated that a replacement cost of the Garnier Beach facility would be $211,033.89. This estimate included a fee for engineering but did not allow for

depreciation or the age of the facility, nor did it consider the revenue and expenses of this particular sewer system. The system studied and reported on in the Garnier Beach area consisted of:

 1,100 long feet of 10 in. V.C. pipe
26,926 long feet of 8 in. V.C. pipe
    86 manholes
 2,075 long feet of 6 in. C.I. pressure line
     1 pumping station
   502 service laterals
     1 sewerage treatment plant

The replacement cost value arrived at by Poly Engineering was one it considered would be a fair value at which to purchase the sewer system. Poly Engineering recognized the fact that the county might have to pay more or less depending on the circumstances, but considered it a fair figure on which to begin negotiations.

On February 10, 1965, Florida Utility offered to sell the Garnier Beach sewerage disposal plant and collection system to Okaloosa County for $255,200. On April 20, 1965, Okaloosa County representatives made a counter offer to buy the system from Florida Utility at $160,000. This counter offer was rejected by Florida Utility. On September 16, 1965, Florida Utility contracted with Okaloosa County to sell its sewer system at the Garnier Beach subdivision to the county for $200,000.

In a preliminary engineering report dated January 1966, Poly Engineering noted that the Florida Utility sewer system "is in good condition and no improvements are planned to be made to this system. The treatment plant will be expanded later to serve as the main plant in the Ocean City section for the County System."

Since the purchase of the Garnier Beach sewer system Okaloosa County has had financial difficulty operating it and has been involved in a lawsuit concerning pollution of the area from the operation of this sewer system. The State Board of Health ordered that the Garnier Beach sewer system be placed on immediate notice as a danger to health and issued a citation to Okaloosa County to proceed immediately to provide a more adequate sewerage disposal system for the area. The county now has plans to completely eliminate the sewerage-treatment plant sold to it by Florida Utility located in Garnier Beach.

Beginning several years prior to 1962 Warrington made advances to Dean which were used for the payment of his personal expenditures and in the making of personal investments. The account under which these advances were recorded was a personal account of Dean, although the exact designation of the account is not shown. There was no schedule for repayment of the advances. At the end of the year the outstanding balance would be decreased by the amount of Dean's salary.

Over the years the personal account balance has fluctuated in amount but has gradually increased. The account balance as of the end of 1963 was $112,378. Prior to 1962 or 1963 no interest was charged on the personal account balance. It was not secured in any way. For taxable years 1962 and 1963 at least, no notes or other evidence of indebtedness were given by petitioners to Warrington for the personal account balance set forth on the books of Warrington; neither was there any obligation of Dean to pay interest on the account balance.

In July of 1963, Dean paid Warrington $12,000 on this account by check. No allocation was made at the time between interest that might be owing and the principal amount. Subsequently Warrington's accountant notified Dean that $6,343.35 of this amount was applied to interest and the balance was applied to the principal of the account.

As of the beginning and the end of 1964 Warrington had earned surplus of $537,054 and $538,029, respectively. No evidence has been introduced to show that Warrington has ever declared and paid formal dividends.

The transfer of the sewerage facilities by Warrington to Florida Utility in 1964 did not result in a dividend distribution to petitioners.

The increases in the balance of the personal account of Dean in 1962 of $16,085.10 and in 1963 of $1,014.21 were not bona fide debts of Dean to Warrington, but constituted taxable dividends to the petitioners in those amounts in 1962 and 1963.

Claimed interest expense on the advancements of Warrington to Dean in the amounts of $6,343.35 in 1963 and $6,588 in 1964, were not paid on a bona fide indebtedness of Dean to Warrington within the meaning of section 163 of the Internal Revenue Code of 1954.

OPINION

The first issue to be decided concerns whether the transfer in 1964 by Warrington to Florida Utility of certain sewer facilities resulted in taxable dividends to petitioners.

Respondent's statutory notice of deficiency states:

It is determined that during the year 1964 the following property was transferred to you by the Warrington Home Builders, Inc.:

| | |
|---|---|
| Garnier Beach Facility | $170,347.00 |
| Mayfair Facility | 85,174.00 |
| Total | 255,521.00 |

As a result of these transfers, it is held that you received taxable dividends includible in your gross income under Section 61 of the Internal Revenue Code.

The petition filed in this case reads, at paragraph 5(h):

During the taxable year ended December 31, 1964, no property was transferred to Petitioners by Warrington Home Builders, Inc. No such transfers were made

as determined by Commissioner in his Notice of Deficiency, attached hereto as Exhibit A; this determination is not supported by any facts and, therefore, must be regarded by Petitioners as a misstatement of a material fact.

As a threshold question, petitioners argue that because the respondent has not amended his pleadings to correct the alleged misstatement of fact, the Court should not consider this issue.

Nowhere in their argument do petitioners contend that they did not fully understand the meaning of the explanation in the statement attached to the statutory notice. They only contend that the respondent has not clarified the matter by his pleadings.

In support of their argument, petitioners cite *Warner G. Baird*, 42 B.T.A. 970 (1940), which dealt with a situation where on brief respondent first suggested that the giving of a quitclaim deed may have relieved the taxpayer of a liability for taxes. The Court recognized that petitioner had no reason to suppose that there was any issue except whether giving the quitclaim was to be regarded as a sale or exchange. The Court there stated:

While the Government is not limited or bound by an inept or inadequate deficiency notice, there is ample opportunity, by timely pleadings, for the expansion of the issues of fact and law so that they can be fully explored and presented before the end of the trial.

In that case the Court decided there was a new issue first raised on the brief which would require additional evidence on the new issue raised. In the present case there is no need for this Court to consider any additional evidence to determine whether the respondent's determination of a deficiency is correct.

It is respondent's position that as a matter of tax law, both sewer facilities were transferred by Warrington to Dean, as sole shareholder, and he in turn transferred them to Florida Utility. Thus, that the explanation given in the statement attached to the statutory notice is correct as a matter of law even though it may not have been worded as precisely as may have been desired.

We do not consider petitioners' contention as one to be taken lightly, but because, in fact, the petitioners were well aware of the issues involved in this case and, indeed, introduced lengthy evidence to rebut the respondent's determinations and fully explore these issues, they have not been prejudiced in any way from developing their case to the fullest degree. *A. Finkenberg's Sons, Inc.*, 17 T.C. 973, 980-981 (1951) ; *Hay* v. *Commissioner*, 145 F. 2d 1001, 1007 (C.A. 4, 1944), affirming 2 T.C. 460, certiorari denied 324 U.S. 863, rehearing denied 324 U.S. 891. Accordingly, as to this question, we reject petitioners' view and will proceed to the substantive issues involved.

Respondent contends that Dean, as sole shareholder of Warrington, caused it to transfer the sewer facilities at Garnier Beach and Mayfair

to Florida Utility for no consideration at a time when the facilities had a fair market value of $255,200. In effect, respondent argues that for tax purposes, Warrington transferred the facilities to Dean who, in turn, transferred them to Florida Utility.

Petitioners contend that the transfers to Florida Utility were for bona fide business reasons and, at best, resulted in only a derivative benefit to Dean and, therefore, such transfers did not constitute taxable distributions to petitioners.

As an alternative argument, petitioners contend that if a dividend distribution is found to have taken place, the fair market value of the facilities at the time of transfer was zero. Because of our holding on the primary issue, it is not necessary to reach the alternative argument raised by petitioners.

Section 61 [1] of the Code provides that gross income includes dividends. Section 301 of the Code provides that a distribution of property by a corporation to a shareholder with respect to its stock is, to the extent that the distribution is a dividend as defined by section 316, includable in gross income. Section 316 defines a dividend as any distribution of property made by a corporation to its shareholders out of its earnings and profits accumulated after February 28, 1913. Section 317 defines "property" as including money, securities, and any other property.

Section 1.301–1(j) of the Income Tax Regulations provides that if property is transferred by a corporation to a shareholder which is not a corporation for an amount less than its fair market value in a sale or exchange, such shareholder shall be treated as having received a distribution to which section 301 applies.

. It has been well established that a corporate distribution can be attributed to a particular individual if it is expended for his personal benefit or in discharge of his personal obligation. It is not necessary that the funds be distributed directly to him. *Edgar S. Idol*, 38 T.C. 444 (1962), affd. 319 F. 2d 647; *Challenge Mfg. Co.*, 37 T.C. 650 (1962).

The test then, in deciding whether a transfer of property from one corporation to another corporation is a dividend to a stockholder of the transferor, is whether the transfer was for the benefit of the stockholder. *W. B. Rushing*, 52 T.C. 888 (1969).

In *Rushing*, petitioner owned all the stock of two corporations. Corporation A was organized to develop a residential area and corporation B was organized to develop a shopping center on adjacent land. Corporation B loaned money to its sister corporation to help finance

---

[1] All section references herein are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.

the land purchase. The Commissioner contended that the "loaned funds" were constructive dividends to the stockholder because of the transfer from one controlled corporation to another. The Court noted that the fact that Rushing was the sole shareholder in both corporations was not a sufficient basis for concluding that he constructively received this money, and that, inasmuch as the primary benefit was not to the stockholder, there was no constructive dividend.

In *Commissioner* v. *George W. Offutt III*, 336 F. 2d 483 (C.A. 4, 1964), affirming a Memorandum Opinion of this Court, a situation similar to the facts in the instant case was present. There the taxpayer completely owned a development corporation which acquired a tract of land for a subdivision. He first tried, unsuccessfully, to obtain water and sewer service from a nearby municipality. Without provision for proper water and sewer service, the State and county authorities would not approve the project. Offutt then organized a corporation to operate the utilities of the subdivision. The development corporation transferred the sewer and water facilities it had constructed for no consideration other than the utility company's "obligation to maintain the facilities and furnish continuous water and sewerage service to the houses in the subdivision." Offutt also owned a forty percent (40%) interest in another development corporation. The sewer and water facilities constructed by this corporation were transferred to the utility company.

It was a common practice in that State for real estate developers to construct the water and sewer facilities in conjunction with the other improvements and to transfer them to a municipality or public service corporation without any consideration except the transferee's obligation to furnish service to the purchasers of the homes in the subdivision. Other developers in that area had transferred their utility facilities without consideration to utility companies in which the developers had no interest. It was a requirement in order to get approval for the subdivision that the water and sewer service meet the approval of the county and State authorities. The development companies deducted the cost of the utilities they transferred as part of the cost of the houses sold. The Commissioner, however, took the position that the cost of the construction of the utilities was not an allowable expense to the developer corporation but was a dividend to Offutt since the utility facilities were transferred to a utility company which he solely owned. The court, indicating that a valid business purpose existed for these transfers, held that there was no dividend involved in the transfer of these facilities.

The factors that influenced the court's decision in *Offutt* are also present here. It has been shown that it was a common practice in 1964 for

real estate developers to construct water and sewer facilities and then transfer them to another corporation for their operation without monetary consideration. This is not to say, however, that these facilities were transferred for no consideration at all. Warrington was in the business of building homes, not running a utility company. It was operating these sewer systems only as a last resort in order to get the subdivisions approved for financing. Warrington had experienced various difficulties in operating these facilities and the benefit of having them segregated from the home-building corporation, thereby freeing them of possible liability for pollution plus any adverse publicity which could affect the sales of Warrington homes, as well as relieving them of the continued maintenance required on the systems, is something that may be difficult to measure in monetary terms, but is nevertheless real consideration.

Furthermore, both the representative from the Florida State Board of Health and from the FHA testified that where it is deemed feasible, they required a central sewerage disposal system be installed by the developer. The parties have stipulated to the validity and existence of both Warrington and Florida Utility as corporations and nowhere has the respondent sought to disregard the corporate entities in this case.

The respondent seeks to distinguish the *Offutt* case on the grounds that Offutt was not a controlling stockholder of the transferor corporation, whereas Dean owned all of the stock of Warrington. While this is a factor to be considered along with others in determining whether a dividend took place, in and of itself it is not controlling, especially when the record shows, as it does in this case, that Warrington had a valid business purpose in making these transfers and that, other than in a derivative way, Dean did not benefit from these transfers. *W. B. Rushing, supra.*

Respondent argues further that in *Offutt* the State law required a development company to transfer its facilities to either a municipality or a regulated public utility, whereas Florida State law has no such requirement and the transfer from Warrington to Florida Utility was not a prerequisite to the continued development of housing in either of the subdivisions. The requirement of the State law was not the controlling factor in *Offutt;* it was merely one of the facts that went to show that the transfers took place for a valid business purpose. In the present case, while there was no requirement of State law that these transfers be made, there was a valid business purpose in the separation of the sewer operation from the home-building operation and the transfers were necessary in carrying out that purpose.

Respondent cites the case of *George W. Knipe*, T. C. Memo 1965–131, affirmed per curiam *sub nom. Equitable Publishing Co.* v. *Commis-*

*sioner*, 356 F. 2d 516 (C.A. 3, 1966), for his proposition in the present case that a transfer between corporations controlled by the same ownership may constitute, under the principle of *Helvering* v. *Horst*, 311 U.S. 112 (1940), an assignment of dividend income by the stockholders who are the same in both corporations.

The *Knipe* case is distinguishable on its facts. In the present case there was no common control. Florida Utility was wholly owned by May First, which in turn was controlled by Dean's son-in-law and wife. Dean owned no stock of either corporation. Respondent has not argued, nor does the record show, that May First and Florida Utility were not viable corporate entities independent of Dean. Also, in *Knipe*, the Court found that the agreements by which income from one corporation was transferred to another corporation were not made for "any proper corporate purpose." In the present case, we have found that there was a valid business purpose for the transfers.

Respondent's determination that petitioners received a taxable dividend as the result of the transfer by Warrington of its sewer facilities to Florida Utility is not sustained.

The second issue involves the question whether the increases in the personal drawing account of Dean in the amounts of $16,085.10 for 1962 and $1,014.21 for 1963, shown on the books of Warrington, constituted taxable dividends to the petitioners, as contended by respondent, or were loans, as contended by petitioners.

Respondent's determination that the withdrawals constituted distributions taxable as dividends is presumed to be correct and the burden of proof rests upon the petitioners to show that respondent's determination was erroneous. Rule 32, Tax Court Rules of Practice; *Welch* v. *Helvering*, 290 U.S. 111 (1933).

Whether the withdrawals were loans or dividend distributions is a question of fact to be determined upon consideration of all the facts and circumstances present, and depends upon the intent of the parties existing at the time the withdrawals were made. *Clark* v. *Commissioner*, 266 F. 2d 698 (C.A. 9, 1959), affirming on this issue a Memorandum Opinion of this Court; *William C. Baird*, 25 T.C. 387 (1955); *Carl L. White*, 17 T.C. 1562 (1952); *Ben R. Meyer*, 45 B.T.A. 228 (1941); *Wiese* v. *Commissioner*, 93 F. 2d 921 (C.A. 8, 1938), affirming 35 B.T.A. 701, certiorari denied 304 U.S. 562, rehearing denied 304 U.S. 589. See also the court's charge to the jury in *Varnadow, et al.* v. *United States* (E.D. Tenn. 1962), 11 A.F.T.R. 2d 834, 62–2 U.S.T.C. par. 9606; and 1 Mertens, Law of Federal Income Taxation, sec. 9.21.

Since intent is a state of mind rarely susceptible of proof by direct evidence, the courts have generally considered a number of criteria for the purpose of determining the true intent and purpose of the parties at the time the withdrawals were made and whether such withdrawals

were loans or constituted taxable dividends. No single factor, standing alone, is deemed controlling but is to be considered along with all the facts and circumstances present.

Petitioners point to three factors which they claim are established by the evidence and clearly characterize the advances to Dean as loans. *First*, they argue that Warrington consistently treated the advances to Dean as loans on its books and records; *second*, that interest was charged to and paid by Dean on the amounts allegedly borrowed from Warrington; and *third*, that Dean in fact made repayments to Warrington on these advances.

It is well established that bookkeeping entries, although of evidential value in some circumstances, are not conclusive. *Doyle* v. *Mitchell Bros. Co.*, 247 U.S. 179, 187 (1918) ; *Helvering* v. *Midland Ins. Co.*, 300 U.S. 216 (1937) ; *William C. Baird, supra; Ben R. Meyer, supra*. This is especially true where the bookkeeping entries are contrary to the realities of the transaction. *William C. Baird, supra.*

More important in the present case is the fact that the evidence presented does not show exactly how the withdrawals were treated on the books of the corporation. None of the accounting records were placed in evidence. The mere statement of petitioner's accountant that "Mr. Dean had a loan account with Warrington Home Builders" is not sufficient to show that the account to which the withdrawals were charged was designated as "Loans," "Accounts Receivable," or some similar designation on the books of the corporation. In all other instances counsel for both parties and the witness referred to the account as the Dean account, the account of W. K. Dean, or simply as an open account. No notes or other written instruments were executed by petitioner which would indicate that the withdrawals were intended as loans. No action was shown to have been taken by the board of directors authorizing loans to the petitioner Dean. No security was given and there was no agreement, written or oral, fixing a date or dates for repayment or for the charging of interest on the amounts withdrawn. We find no support in the record for petitioners' contention that the withdrawals by Dean were treated on the books and records of the corporation as loans.

The fact that the corporation subsequently sued and recovered payment from Webb, petitioners' former son-in-law, for similar advances made to him while an officer of the corporation, does not affect the result in the present case. Cf. *Chism's Estate* v. *Commissioner*, 322 F. 2d 956 (C.A. 9, 1963), affirming a Memorandum Opinion of this Court. Webb was not a stockholder of Warrington. Morever, the action was not taken until after Webb was divorced from petitioners' daughter, and, Webb admitted his liability. It is significant that no

enforcement action has been taken by the corporation against Dean, its sole stockholder.

In the absence of adequate records we also find no support for petitioners' contention that interest was "charged to" or "paid" by Dean on the amounts withdrawn by him, during the years in question. Petitioners' accountant testified that interest had not been charged to or paid on the Dean account, which had existed for quite a number of years, prior to 1962 or 1963. He stated that the check dated July 19, 1963, in the amount of $12,000, "was applied first to interest and the balance applied to principal." When pressed for a direct answer as to what the books of the corporation showed, however, he testified that the books showed the check was applied "to the account" and did not show "a part to principal and a part to interest." He stated that he had determined that a part of the payment should be applied to interest and a part to principal upon his examination of the books and records after the close of the year and after an internal revenue agent had made an audit of the company's accounts for prior years.

The payment of $12,000 on July 19, 1963, which was credited to the Dean account, does not of itself establish that the advances to Dean were intended as loans. In amount the payment was little more than 10 percent of the $112,378 balance of the account as of the end of 1963. Moreover, it was obviously prompted by questions which had been raised by the internal revenue agent upon audit of Warrington's accounts for prior years. Petitioners' accountant admitted that this had been a factor in the payment. Except for salaries which had been credited at the end of each year, there is no evidence that any other payment had been made during the many years the account had existed.

Considering all the facts and circumstances, including the absence of written agreements, notes, interest, security arrangements, or the fixing of any date for repayment, as well as the fact that the corporation has paid no formal dividends, notwithstanding its earned surplus and accumulated profits was in excess of $500,000 as of the beginning and end of 1964, we hold that the withdrawals or advances to Dean were not loans and that the increases in the personal drawing account of Dean in the amount of $16,085.10 for 1962 and $1,014.21 for 1963, as shown on the books of Warrington, constituted taxable dividends to the petitioners. We have carefully examined the numerous cases cited by the petitioners. Each of them was decided on its own particular facts differing in many respects from those in the present case. They do not, in our opinion, require a conclusion different from the one we have reached in this case.

In view of our conclusion that the advances to Dean were not loans, the amounts allegedly paid by him as interest thereon in 1963 and 1964 are not deductible as interest expenses under the provisions of section 163 of the Internal Revenue Code of 1954.

Finally, in view of respondent's concession, on brief, that the advances to Webb were loans, the amount reported by Warrington on its return for 1964 as interest income received from Webb and removed from interest income by respondent in his statutory notice, should be returned to the interest income of Warrington and, since Warrington was a small business corporation in 1964, the taxable income of petitioners in 1964 should be increased by the same amount.

*Decision will be entered under Rule 50.*