MILTON FALKOFF and JEANNETTE L. FALKOFF, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Falkoff v. Commissioner
Docket No. 6709-74.
United States Tax Court
T.C. Memo 1977-93; 1977 Tax Ct. Memo LEXIS 350; 36 T.C.M. (CCH) 417; T.C.M. (RIA) 770093; March 31, 1977, Filed *350 A partnership was indebted to the First National Bank in the amount of $15.9 million. This indebtedness was secured, in part, by the partnership's stock of Corporation A and its subsidiaries. Corporation A had no earnings and profits available for distribution as a dividend. Corporation B, a subsidiary of Corporation A, was about to sell property at a gain of $10 million. A plan was evolved whereby Corporation A would obtain a loan of $18 million from the First National Bank, secured by the assets then held to secure the indebtedness of the partnership. Corporation A would thereupon repay an indebtedness of $7.5 million owing to the partnership and distribute an additional $10 million to the partnership as a distribution with respect to the corporation's stock.The partnership would, in turn, use the funds to repay its loan to First National Bank. Upon completion of the sale of the property by Corporation B, immediately following the close of Corporation A's fiscal year, Corporation B would lend $10 million of the proceeds from the sale to Corporation A to enable Corporation A to repay, in part, its $18 million loan to the First National Bank. Thereafter, Corporation A satisfied *351 its indebtedness to Corporation B by transferring assets held by Corporation A, including the stocks of other subsidiaries. Held: The transaction with First National Bank whereby Corporation A borrowed $18 million with the understanding that the proceeds would be used to pay off the indebtedness of the partnership to the bank was entered into primarily for the benefit of the partnership. First National Bank did not make the loan to Corporation A on the faith and credit of that corporation, but on the security and on the credit of the partnership. Accordingly, the indebtedness of Corporation A to First National Bank should be deemed to have been incurred for the benefit of the partnership. Any repayment on account of that loan would be taxable to the partnership as a dividend to the extent of the earnings and profits of Corporation A. Such earnings and profits include the earnings and profits of Corporation B to the extent of the amount paid by Corporation B for the stock of related corporations held by Corporation A. Byron S. Miller,Alan L. Reinstein and Geoffrey F. Grossman, for the petitioners. Seymour I. Sherman, for the respondent. QUEALY
MEMORANDUM FINDINGS OF FACT AND OPINION *352 QUEALY, Judge: Respondent determined a deficiency in petitioners' Federal income tax for the calendar year 1969 in the amount of $164,425.52. The remaining issue for decision is whether a series of transactions, whereby the indebtedness of the partnership in which the petitioner had an interest to the First National Bank of Chicago was repaid, resulted in a distribution of earnings and profits by Henry Crown and Company, a corporation, the stock of which was owned by the partnership. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts together with exhibits attached thereto are incorporated herein by this reference. Milton Falkoff and Jeannette L. Falkoff, husband and wife, resided at the time this petition was filed in Lincolnwood, Illinois. They filed their joint Federal income tax return for the calendar year 1969 on the cash receipts and disbursements basis with the District Director of Internal Revenue at Chicago, Illinois. Milton Falkoff will sometimes be referred to hereafter as petitioner. The petitioner was the beneficial owner of a 2.5 percent interest in a partnership doing business as Henry Crown and Company, Not Incorporated, *353 hereinafter referred to as the partnership. At all times since its formation, the partnership has reported its income and kept its books and records on the cash basis and has used the calendar year as its taxable and fiscal year. Henry Crown and Company (hereinafter sometimes referred to as the corporation) is an Illinois corporation originally organized under the name of Exchange Building Corporation.At all times material herein, the corporation and its subsidiaries kept their books and records and filed consolidated Federal income tax returns on the accrual basis for the fiscal year ending September 30. No election was made under the consolidated return regulations for the consolidated group to adjust earnings and profits currently. [1]
On December 24, 1959, the partnership acquired all of the issued and outstanding stock of Henry Crown and Company, together with a promissory note, dated December 15, 1959, made by the corporation in the principal amount of $7,500,000 payable December 31, 1969, with interest at the rate of 7 percent per annum owing only after such date. At the same time and in the same transaction, the partnership also acquired *354 all of the issued and outstanding stock of the LaSalle Corporation (hereinafter referred to as LaSalle), Arrowhead Venture, Inc. (hereinafter referred to as Arrowhead), and Mascar Corporation (hereinafter referred to as Mascar), and promissory notes made by each of them, each dated, maturing and bearing interest under the same terms and conditions as the note of Henry Crown and Company referred to above, and having respective principal amounts payable as follows: $1,650,000 by LaSalle, $3,250,000 by Arrowhead and $900,000 by Mascar. On January 1, 1964, the partnership contributed the stock and notes of LaSalle, Arrowhead and Mascar to the capital of Henry Crown and Company, so that from that date henceforth, LaSalle, Arrowhead and Mascar were wholly owned subsidiaries of the corporation. The principal balance due on the Arrowhead note had by then been reduced to $2,290,000. The principal balances due on the notes of LaSalle and Mascar were unchanged from December 24, 1959. On April 1, 1967, Henry Crown and Company caused to be organized under the laws of Illinois, the Exchange Building Corporation (hereinafter referred to as Exchange), to which the corporation contributed certain *355 property located in Contra Costa County, California, known as the San Ramon Ranch. For some months prior to September 30, 1969, there were intermittent negotiations for the sale of the San Ramon Ranch by Exchange to an undisclosed buyer, acting through one Willis Hannawalt, an attorney. Such negotiations resulted in an agreement in substance with respect to such sale on or before September 30, 1969. By October 1, 1969, the attorneys for Exchange and the attorneys for Western Electric Company (hereinafter referred to as Western Electric), the undisclosed purchaser, had completed all the documents which would be required to consummate the sale. An escrow agent had been selected by the parties and an agreement had been entered into with respect to the instructions and procedures to be followed. On October 1, 1969, the attorney for Exchange traveled from Chicago, Illinois, to San Francisco, California, and deposited with the escrow agent the various documents which had duly been executed by or on behalf of Exchange. On October 2, 1969, the documents were delivered by the escrow agent to the attorney for the purchaser and, in accordance with the prior agreements, the sum of $12,191,709.39 *356 was transmitted to the First National Bank of Chicago (hereinafter referred to as the First National Bank), as of the opening of business on that date, for the account of Exchange.
In accordance with the foregoing procedure, the San Ramon property was sold to Western Electric for a price of $12,250,000 subject to adjustments for taxes, assessments and transfer tax. The transaction was reflected in the consolidated Federal income tax return of Henry Crown and Company and subsidiaries for the fiscal year ending September 30, 1970, as a long-term capital gain of $11,002,410.02, resulting from the sales price of $12,250,000 less basis and costs and expenses of sale of $1,247,589.98. Prior to September 29, 1969, the partnership was indebted to the First National Bank in the amount of $15,900,000. This indebtedness was represented by the balance due on various notes, as follows: Date Executed
Date Due
Balance Due
12/18/68
12/31/69
$ 4,000,000
1/22/69
12/31/69
500,000
5/20/69
1/02/70
11,000,000
5/20/69
1/02/70
400,000
Total
$15,900,000
The indebtedness to the First National Bank had been guaranteed by Robert Crown and Lester Crown, general partners. Robert Crown died on July 6, 1969. Thereafter, the *357 First National Bank released the decedent's guarantee of the partnership's indebtedness. In anticipation of the sale of the San Ramon property by Exchange, a plan was evolved whereby the indebtedness of the partnership to the First National Bank would be repaid or refinanced using, in part, the proceeds from the contemplated sale of such property. Pursuant thereto, the following transactions took place: (1) On September 29, 1969, the First National Bank made a loan of $18 million to Henry Crown and Company as the borrower of record, payable on demand. The loan was secured by a pledge of certain assets belonging to either the partnership or Henry Crown and Company, including all of the issued and outstanding stock of Henry Crown and Company. First National Bank valued the pledged collateral at $30,213,365, consisting of the following: [2] Shares
Corporation
Value
25,000 s/s
Henry Crown and Company)
10 s/s
Thomas B. Bishop Co.)
$ 6,414,000
100 s/s
The Park-Grey Corp.)
500 s/s
Arrowhead Venture, Inc.
6,000,000
6,000 s/s
The LaSalle Corp.
1,453,123
400 s/s
Mascar Corp.
308,017
50,000 s/s
Exchange Bldg. Corp.
15,600,000
5,000 s/s
Lindrick Service Corp.
33,688
5,000 s/s
Lindrick Corp.
5,000
1,000 s/s
Mile 300 Company
99,537
200 s/s
DPV Corporation
300,000
$30,213,365
*358 (2) On September 29, 1969, Henry Crown and Company discharged its promissory note held by the partnership by payment of the sum of $7.5 million. At the same time the corporation made a distribution to the partnership with respect to the stock of Henry Crown and Company in the amount of $400 per share, for a total of $10 million. (3) On September 29, 1969, the partnership paid First National Bank the sum of $15,500,000, which was credited as full payment of three of the four notes held by the bank. After this payment, the partnership remained indebted to First National Bank for $400,000 on the remaining note and $628,034.23 for interest due on the prior indebtedness, for which the partnership gave its note. (4) On October 2, 1969, LaSalle paid $1.5 million and Arrowhead paid $1.4 million to Henry Crown and Company as partial payment of the respective notes held by the corporation. On that same day, the *359 corporation paid $3 million to the First National Bank as partial payment of its $18 million loan. (5) On October 3, 1969, Exchange transferred the sum of $10 million to Henry Crown and Company, receiving the corporation's note for $10 million due September 30, 1970. (6) On October 3, 1969, Henry Crown and Company paid $10 million to the First National Bank as an additional payment on account of the corporation's indebtedness to the bank. This payment reduced the outstanding principal amount of the $18 million loan to $5 million. In a memorandum dated October 3, 1969, James Bourke, the loan officer of First National Bank who approved the loan of $18 million to Henry Crown and Company, set forth his understanding with respect to these various transactions, as follows: [3]
On Monday, September 29, Mr. Henry Crown called to discuss new financing for Henry Crown and Company. Henry Crown and Company is a corporation and one of its subsidiaries is Exchange Building Corporation. Among the assets of Exchange Building Corporation is an investment in the Santa Barbara and San Ramon areas in California composed of the Santa Barbara Ranch 3,180 acres and the San Ramon Ranch 1,788 acres. The *360 San Ramon Ranch is carried on the Exchange Building Corporation balance sheet as of December 31, 1968, at $921,329. This ranch has recently been sold for $12,250,000. The transaction will take place on either Thursday or Friday of this week, October 2 or 3. The ranch was sold to the Western Electric Company, a subsidiary of AT&T. It is Mr. Crown's intention, upon receipt of the proceeds of the sale, to have Exchange Building Corporation declare a dividend to its parent, Henry Crown and Company, for the full amount of the sale. For business and tax reasons, Mr. Crown requested a $15-18,000,000 secured loan to Henry Crown and Company, the parent, for the purpose of having the parent pay off intercompany and affiliate corporation advances and borrowings. Upon receipt of the proceeds of the land sale, Exchange Building Corporation will pay the total proceeds to its parent, Henry Crown and Company, who in turn will pay down this new loan to $5,000,000. We have been advised by Henry Crown and Milton Falkoff that there has been no substantial change in the financial statements of Henry Crown and Company or Exchange Building Corporation since September 30, 1967, at which time the Arthur *361 Andersen & Co. audit report showed a net worth for Henry Crown and Company of $9,318,602 and for Exchange Building Corporation of $5,221,444. As of September 29, 1969, our business loans to the Crown Complex aggregated $17,400,000, against which various loans we held sundry collateral having a collateral value of $61,830,240. The largest loan in the Complex was to Henry Crown and Company Not Incorporated a partnership, in the amount of $15,900,000, against which we held collateral having a collateral value of $49,666,996, $32,338,308 of which was various unlisted securities. Inasmuch as Mr. Crown's request for a $15-18,000,000 loan was to be used for turn-around money and would exist for a short period of time, I indicated to him that I would favorably recommend the credit to our senior management. Mr. Crown and the writer visited with Christopher Wilson who had no objection to our granting this new short-term loan with the understanding that it would be of short duration. Since Henry Crown and Company did not have an account with us, we used as the initial deposit to the new account (No. 55-23966) the proceeds of an $18,000,000 demand note. (Rate 8-3/4%) Simultanteously, Mr. *362 Crown deposited two checks of Henry Crown and Company aggregating $15,500,000 to the Henry Crown and Company Not Incorporated account and delivered to us a check in the amount of $15,500,000 to reduce the present loan outstanding to Henry Crown and Company Not Incorporated. At the time of the transaction, we charged the Henry Crown and Company Not Incorporated account $628,034.73 for interest to date. Later Mr. Falkoff called and said that he would rather not have the interest charged to the company's account but would prefer that we grant Henry Crown and Company Not Incorporated a new loan of $628,034.73 to replace the interest charge, which we agreed to do. Thus, the Henry Crown and Company Not Incorporated loan originally in the amount of $15,900,000 now has a balance of $1,028,034.73 after giving effect to the $15,500,000 payment and the new note for interest of $628,034.73. * * *
On October 2, we received a $3,000,000 reduction in our loan to Henry Crown and Company, reducing the balance to $15,000,000. Today, October 3, we received an additional reduction of $10,000,000, reducing the balance of the Henry Crown and Company loan to $5,000,000. The net effect of the transactions *363 occurring during this past week has been to reduce our loans to the Crown Complex by $10,500,000 to $13,642,000 as summarized on the following page. Net Change in Crown Loans:
Loan 9-29-69
$18,000,000
to Henry Crown and Company
Payment 9-29-69
by Henry Crown and Company
( 15,500,000)
Not Inc.
Payment 10-2-69
( 3,000,000)
by Henry Crown and Company
Payment 10-3-69
( 10,000,000)
by Henry Crown and Company
Net Change
($10,500,000)
Previous Balance,
Crown Complex
24,142,000
Balance, 10-3-69
$13,642,000 Free balances to support our loans to the Crown Complex have averaged $6,200,000 so far in 1969. On October 21, 1969, Henry Crown and Company paid First National Bank an additional $500,000 as further payment on its original $18 million loan. On December 31, 1969, the corporation gave First National Bank a new one-year note in the amount of $4.5 million to replace the principal balance outstanding on the $18 million *364 note. The corporation made payments on this new note as follows: Date
Amount
December 6, 1971
$ 500,000
December 30, 1971
250,000
January 26, 1972
250,000
September 12, 1972
500,000
May 11, 1973
700,000
September 26, 1973
800,000
June 18, 1974
1,500,000
Total
$4,500,000
By September 21, 1970, Henry Crown and Company was indebted to Exchange in the total amount of $12,145,580.33, consisting of the original $10 million loan and other later advances in the amount of $2,145,580.33. On that day, Henry Crown and Company transferred to Exchange certain notes and other assets in full discharge of this liability, consisting of the following: Asset
Assigned Value
Henry Crown and Company's
entire stock interest in
certain wholly-owned
subsidiaries: *
Arrowhead
$1,000,000.00
LaSalle
600,000.00
Mascar
400,000.00
Note Due from Mascar
900,000.00
Current account due from Mascar
152,767.12
Current account due from Lemont
Shipbuilding and Repair Co.
(a wholly-owned subsidiary
of Henry Crown and Company)
2,044,000.00
Land in DuPage County, Illinois
4,735,974.74
Total
$9,832,741.86
The stocks of Arrowhead, LaSalle *365 and Mascar were valued at cost (par). The Mascar note was valued at face. The land was valued at its cost. Additionally, Henry Crown and Company transferred a collateral note payable to Exchange in the face amount of $2.3 million and cash in the amount of $12,838.47. The collateral note of the corporation was secured by beneficial interests in land trusts holding unencumbered interests in real property in downtown Chicago. Exchange recorded these transfers as in full payment of the October 3, 1969, note. After the payment of October 2, 1969, by LaSalle to Henry Crown and Company of $1,500,000, the amount of $150,000 remained due on the LaSalle promissory note. During the fiscal year ending September 30, 1970, LaSalle paid to Henry Crown and Company the $150,000 balance and made advances totaling $1,276,849.04. As of September 30, 1969, Henry Crown and Company had no earnings and profits available for distribution as a taxable dividend. For the fiscal year ending September 30, 1970, respondent determined that the corporation had available for distribution as a taxable dividend earnings and profits in the alternative amounts of $8,890,074.31 and $8,955,817.23, computed as follows: *366 Taxable income per return
$ 940,462.79
$ 940,462.79
(Henry Crown and Company
9/30/70)
Add: adjustment
3,500.00
3,500.00
Less: Federal income tax, etc.
281,395.80
281,395.80
Balance
$ 662,566.99
$ 662,566.99
Dividend from Exchange
$7,016,401.20
$6,950,658.28
Dividend from LaSalle
1,276,849.04
1,276,849.04
Total earnings and profits -
9/30/70
$8,955,817.23
$8,890,074.31
As a result of the transactions enumerated herein, the respondent further determined that Henry Crown and Company made a distribution of such earnings and profits to the partnership, its sole shareholder, as a taxable dividend in the calendar year of the partnership ending December 31, 1969. OPINION On September 29, 1969, the partnership, Henry Crown and Company (Not Incorporated), was indebted to the First National Bank of Chicago in the amount of $15.9 million. The bank held collateral to secure this obligation as well as the personal guarantee of Lester Crown, general partner. The partnership owned all of the stock of Henry Crown and Company, which in turn owned stock of various subsidiaries, including Exchange. For some period of time, negotiations had been taking place for the sale by Exchange to an undisclosed purchaser of certain *367 property in California, known as San Ramon Ranch. It may be presumed that by September 29, 1969, while no agreement of sale had been finalized, negotiations were essentially completed. Sales of such magnitude are not finalized in a matter of a couple of days without prior agreement in principle. The partnership planned to use the cash which would be received by Exchange from the sale of San Ramon Rach to reduce the indebtedness of the partnership to the First National Bank. The distribution of such proceeds by Exchange to Henry Crown and Company and, in turn, by that corporation to the partnership would have given rise to a taxable dividend to the extent of the earnings and profits of Henry Crown and Company, which would have reflected the distribution from Exchange. Instead, the partnership adopted a plan, intended to achieve the same result, without the distribution to the partnership being taxable as dividend. First, the indebtedness of the partnership to the First National Bank in the amount of $15.5 million would be repaid in advance of the sale from the proceeds of a loan of $18 million by the bank to Henry Crown and Company. Thereafter, in the subsequent fiscal year of *368 the corporation, the new loan would be repaid, in part, through funds obtained from the corporation and its subsidiaries, including Exchange. Respondent has attacked this plan as lacking in substance, contending that the transaction resulted in a constructive dividend to the partnership in its taxable year 1969 to the extent of earnings and profits of Henry Crown and Company for its fiscal year ending September 30, 1970. The petitioner acknowledges that the Court may look to the substance of the transactions in determining the resulting tax liabilities of the parties. However, the petitioner contends first that the refinancing of the partnership's indebtedness to the First National Bank served a legitimate business purpose, and secondly that at the time of the distribution of $10 million to the partnership, Henry Crown and Company had no earnings and profits available for distribution as a dividend. Petitioner argues that the respondent is in error in looking to events taking place after the close of the fiscal year ending September 30, 1969, for purposes of determining the earnings and profits of the corporation. Unquestionably, Henry Crown and Company had every right to pay a *369 dividend out of borrowed funds in the taxable year ending September 30, 1969, in anticipation of the realization of a gain which would cover that distribution in the subsequent year. E.g. George M. Gross,23 T.C. 756 (1955), affd. 236 F.2d 612 (2nd Cir. 1956); Thomas Wilson,25 T.C. 1058 (1956). Where, however, the stockholders themselves provide the funds through a bank loan, the distribution may lack both business purpose and economic substance. E.g. Waterman Steamship Corporation v. Commissioner,430 F.2d 1185 (5th Cir. 1970), cert. denied 401 U.S. 939. Cf. United States v. General Geophysical Company,296 F.2d 86 (5th Cir. 1961), cert. denied 369 U.S. 849. At the outset, the question thus presented is whether the transaction whereby Henry Crown and Company ostensibly borrowed $18 million from the First National Bank, with the understanding that the proceeds were to be applied in payment of the indebtedness of $15.5 million by the partnership to the bank, materially altered the relationship between the partnership and the bank. It is clear that the First National Bank did not, in fact, make a loan of $18 million to Henry Crown and Company upon the faith and credit of that *370 corporation. The loan was secured, not only by the stock of subsidiaries owned by Henry Crown and Company, but also by the stock of that corporation itself, which was an asset of the partnership. A corporate borrower cannot pledge its own stock as collateral. Other collateral securing the loan also was not a part of the assets of Henry Crown and Company. As a practical matter, the First National Bank apparently cared little who was the borrower of record. The collateral remained the same. The First National Bank was lending on the "Crown" line of credit. [4] In effect, the loan of $18 million to Henry Crown and Company, was no different than a nonrecourse loan to the partnership with the stock of that corporation and its underlying assets as collateral. The release of Lester Crown from personal *371 liability for the partnership debt to the First National Bank would have accomplished the same result. Taking into consideration the collateral which was available to the First National Bank, there is no reason to believe that such release would not have been freely given. Upon the death of Robert Crown, the other general partner, the First National Bank, released the estate from any liability on account of the debt of the partnership. It is admitted by petitioner that the loan of $18 million was obtained from the First National Bank with the understanding that the proceeds would be used to reduce the outstanding loans of the partnership and that the $18 million loan itself would be repaid, in part, out of the proceeds from the sale of the San Ramon Ranch. Henry Crown and Company did not need the money for its own business. The corporation immediately paid $7.5 million to the partnership in satisfaction of an existing indebtedness and distributed $10 million to the partnership as a return of capital. The corporation was not provided with any additional resources, and there was no reduction in the overall indebtedness of the Crown interests to the First National Bank until payments *372 were made on the $18 million loan following the close of the fiscal year. Except for the fact that the Crown interests increased their indebtedness to the First National Bank in the sum of $2.5 million, albeit for a matter of days, the substitution of the indebtedness of Henry Crown and Company for the indebtedness of the partnership had no practical effect. Nor can it be said that this served any business purpose aside from the overall plan to use the proceeds from the sale of the San Ramon Ranch in order to reduce the Crown indebtedness to the First National Bank. Looking at the transaction as a whole, the conclusion is inescapable that $17.5 million of the $18 million borrowed in the name of Henry Crown and Company from the First National Bank constituted an indebtedness incurred solely for the benefit of its stockholder, the partnership. The assets of the partnership remained pledged to secure that indebtedness. Repayment of the indebtedness, to the extent chargeable as a distribution with respect to the stock of Henry Crown and Company, was primarily for the benefit of the stockholders and, as such, must be considered as a distribution constructively received by them at the *373 time of repayment. Sammons v. Commissioner,472 F.2d 449 (5th Cir. 1972); Wall v. United States,164 F.2d 462 (4th Cir. 1947); Tirzah A. Cox,56 T.C. 1270 (1971), modified in part, 58 T.C. 105 (1972); William F. Wolf, Jr.,43 T.C. 652 (1965), affd. 357 F.2d 483 (9th Cir. 1966); Edgar S. Idol,38 T.C. 444 (1962), affd. 319 F.2d 647 (8th Cir. 1963). However, the amount of the distribution taxable as a dividend should be limited to the amount repaid which is attributable to a distribution by the corporation to its stockholders with respect to its stock, as distinguished from a distribution or payment on account of a preexisting, bona fide indebtedness to such stockholders. Such payments would benefit the partnership in its capacity as a creditor, not as a stockholder. Sammons v. Commissioner,supra at 454. Accordingly, there should be excluded from consideration as a dividend distribution the repayment of the sum of $7.5 million by Henry Crown and Company to the First National Bank as an offset to the cancellation of the preexisting indebtedness of $7.5 million which the corporation owed to the partnership.Total repayments by the corporation to the First National Bank during the calendar *374 year 1969 amounted to $13.5 million. Of this amount, the balance of $6 million--after deducting for the indebtedness of $7.5 million--is taxable as a dividend to the extent of the earnings and profits of Henry Crown and Company, attributable to its taxable year ending September 30, 1970. It therefore becomes necessary to determine such earnings and profits. Respondent would include in the earnings and profits of Henry Crown and Company for the fiscal year ending September 30, 1970, the following items: (1) its taxable income for that fiscal year minus its Federal income tax; (2) open account advances from LaSalle in the amount of $1,276,849.04, which respondent characterizes as a dividended; (3) approximately $7 million of the $10 million loan from Exchange, which respondent also characterizes as a dividend. Petitioner does not question the correctness of respondent's computation of the taxable earnings or income tax of Henry Crown and Company, but objects to the inclusion of the other two items in the computation of earnings and profits. Regarding the open account advances from LaSalle, the record is sparse. The parties have stipulated the amounts transferred and that such amounts *375 were recorded on the books as open account advances. Petitioner asserts that such open account advances are not dividends. Whether withdrawals are loans or dividend distributions is a question of fact to be determined upon consideration of all facts and circumstances present, and depends on the intent of the parties existing at the time the withdrawals were made. Walter K. Dean,57 T.C. 32 (1971); William C. Baird,25 T.C. 387 (1955). From the facts of record, we conclude that respondent's characterization of these advances as dividend distributions must be sustained. First, while the withdrawals were recorded as open account advances or loans, it is well established that bookkeeping entries, although accorded some weight, are not conclusive. Walter K. Dean,supra;C. H. Wentworth,25 T.C. 1210 (1956), affd. 244 F.2d 874 (9th Cir. 1957). Second, the evidence of record strongly indicates the character of these advances as dividends. Petitioner has demonstrated no intent that these advances would be repaid. There was no note given, no security provided and no agreement to pay interest. Additionally, a series of advances were made throughout the fiscal year, suggesting the intention *376 to distribute the earnings of LaSalle for the benefit of Henry Crown and Company. Alterman Foods, Inc. v. United States,505 F.2d 873 (5th Cir. 1974); Oyster Shell Products Corporation v. Commissioner,313 F.2d 449 (2nd Cir. 1963); Walter K. Dean,supra.
The $10 million "loan" from Exchange to Henry Crown and Company raises more complex issues. This "loan" was evidenced by a noninterest bearing note due September 30, 1970. To satisfy this obligation and other advances in the amount of $2,145,580.33, the corporation transferred to Exchange on September 21, 1970, its stock in certain of its subsidiaries, Arrowhead, LaSalle and Mascar, together with other miscellaneous properties. All of these assets were valued for the purpose of this exchange at $9,832,741.86. The difference between this amount and the amount due was made up by Henry Crown and Company's own fully secured note in the amount of $2.3 million and $12,838.47 in cash. Respondent argues that the $10 million distribution in the form of a loan should be considered a dividend to the full extent of the earnings and profits of Exchange since that distribution was part of the plan whereby the profits from the sale of the San *377 Ramon Ranch were distributed for the benefit of Henry Crown and Company. However, respondent fails to provide any substantive basis for this treatment. Respondent, in the alternative, contends that this repayment must be considered as a redemption through a related corporation, within the meaning of section 304(a)(1). [5] That section, as is herein pertinent, states: (a) Treatment of Certain Stock Purchases.-- (1) Acquisition by related corporation * * *--For purposes of sections 302 and 303, if-- (A) one or more persons are in control of each of two corporations, and (B) in return for property, one of the corporations acquires stock in the other corporation from the person (or persons) so in control, then (unless paragraph (2) applies) such property shall be treated as a distribution in redemption of the stock of the corporation acquiring such stock. In any such case, the stock so acquired shall be treated as having been transferred by the person from who acquired, and as having been received by the corporation acquiring it, as a contribution to the capital of such corporation. It is clear *378 that the terms of this section are applicable. Henry Crown and Company was in control of Exchange, Arrowhead, LaSalle and Mascar. Exchange acquired the stock of Arrowhead, LaSalle and Mascar from Henry Crown and Company, the controlling corporation, in partial consideration for the repayment of its $10 million loan to the corporation. As these two requirements of section 304(a)(1) are satisfied, the consideration paid for the stock of Arrowhead, LaSalle and Mascar would be treated as a distribution in redemption of the stock of Exchange, the acquiring corporation. Consequently, pursuant to section 304(a)(1), Henry Crown and Company's repayment of $10 million loan would be treated as a redemption of the stock of Exchange. The amount of the dividend or distribution of earnings and profits which results from this redemption pursuant to section 304(a)(1) is limited to the consideration paid for that stock. Of the total amount of $10 million, which was the consideration Exchange paid to Henry Crown and Company for the stock and other properties, only $2 million represents the price paid for the Arrowhead, LaSalle and Mascar stock. Consequently, the $2 million would be the maximum amount *379 of the dividend attributable to the redemption. As a redemption, this repayment would not fall within any of the savings provisions of section 302(b), and consequently would constitute, pursuant to section 302(d), [6] a dividend to Henry Crown and Company to the extent that Exchange had sufficient earnings and profits to cover the value of the redeemed stock. Petitioner, however, contends that assuming section 304(a)(1) would otherwise be applicable, this transaction would also fall within the scope of section 351, as a transfer to a controlled corporation. Petitioner maintains that where both of these sections are applicable, section 351 would be controlling. Henry Mck. Haserot,46 T.C. 864 (1966), affd. subnom. Commissioner v. Stickney,399 F.2d 828 (6th Cir. 1968). Section 351 provides: (a) General Rule.--No gain or loss shall be recognized *380 if property is transferred to a corporation (including, in the case of transfers made on or before June 30, 1967, an investment company) by one or more persons solely in exchange for stock or securities in such corporation and immediately after the exchange such person or persons are in control (as defined in section 368(c)) of the corporation. For purposes of this section, stock or securities issued for services shall not be considered as issued in return for property. This section would apply to any transaction where property is transferred to a corporation by one or more persons in exchange for stock or securities in such corporation. In the case presently before the Court, there was no issuance by Exchange of its securities to Henry Crown and Company. In substance, the assets were sold by Henry Crown and Company to Exchange for cash. The value assigned to the property equaled the value of the note and advances. Under such circumstances, this Court has held that section 351 does not take precedence over section 304(a)(1). Rose Ann Coates Trust,55 T.C. 501, 512 (1970), affd. 480 F.2d 468 (9th Cir. 1973). cert. denied 414 U.S. 1045. Consequently, we conclude that the transfer *381 of the stock of Arrowhead, LaSalle and Mascar by Henry Crown and Company to Exchange resulted in a dividend in the amount of $2 million from Exchange to Henry Crown and Company. We also conclude, on the basis of the above, that Henry Crown and Company had total earnings and profits for the fiscal year ending September 30, 1970, of $3,939,416.03, consisting of (1) its taxable income minus Federal income tax in the amount of $662,566.99; (2) dividends from LaSalle in the amount of $1,276,849.04; and (3) a dividend from Exchange in the amount of $2 million. Thus, the repayments in the amount of $6 million on the loan from the First National Bank which were constructive distributions with respect to the stock of Henry Crown and Company would be dividends to the partnership in its taxable year 1969 in the amount of $3,939,416.03. The remainder of the payments would reduce the partnership's basis in the stock of Henry Crown and Company. Since we have held that the $18 million loan from the First National Bank was taken primarily for the benefit of the partnership, the subsequent repayment of the $4.5 million of this loan, remaining due on account at December 31, 1969, would also constitute *382 distributions taxable as a dividend to the extent Henry Crown and Company has sufficient earnings and profits. Fehrs Finance Co.,58 T.C. 174 (1972), affd. 487 F.2d 184 (8th Cir. 1973). Decision will be entered under Rule 155. Footnotes
1. See Section 1.1502-33, Income Tax Regs.↩
2. The value First National Bank assigned to the collateral was either its appraised value or, where there was no appraised value, the book value of the assets. The value attributed to the stock of Henry Crown and Company did not include the value of the stock of its subsidiaries.↩
3. It will be noted that the memorandum is dated after the consummation of the sale of the San Ramon property. At that time, it was known that the buyer was Western Electric. Prior thereto, the loan officer could only had known that there was a sale in contemplation to an undisclosed purchaser.↩
*. Presumably, subject to the assignment to First National to secure the indebtedness of Henry Crown and Company or the partnership.↩
4. Mr. Gaylord Freeman, former chairman of the First National Bank, testified that First National regarded all of the Crown enterprises as one complex for loan purposes. Mr. Freeman additionally testified that the Crown complex had a line of credit of approximately $50 million and the collateral for any particular Crown loan would generally be considered collateral for any other Crown loans.↩
5. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954.↩
6. Section 302(d) provides: (d) Redemptions Treated as Distributions of Property.--Except as otherwise provided in this subchapter, if a corporation redeems its stock (within the meaning of section 317(b)), and if subsection (a) of this section does not apply, such redemption shall be treated as a distribution of property to which section 301 applies.↩