FRANCIS E. SULLIVAN, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Sullivan v. Commissioner
Docket No. 29959-82.
United States Tax Court
T.C. Memo 1985-217; 1985 Tax Ct. Memo LEXIS 412; 49 T.C.M. (CCH) 1408; T.C.M. (RIA) 85217; May 8, 1985. B. Gray Gibbs,Joel D. Bronstein,John R. Kiefner,Jr., and Sharon E. Selk, for the petitioner. Willie Fortenberry, for the respondent. SCOTT
MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in petitioner's income tax and additions to tax for the years 1976 and 1977 as follows: Additions to Tax
Year
Tax
Under Sec. 6653(b) [1]
1976
$ 898.51
$ 449.26
1977
193,009.91
96,504.96
The issues for decision are (1) whether respondent, in computing petitioner's income for the taxable years 1976 and 1977 by the source and application of funds method, erred in failing to allow petitioner *413 credit for loans received in 1977 in the amounts of $262,000 and $20,000 which represents the value of an automobile furnished to petitioner to use as a downpayment on a boat; and (2) whether any part of an underpayment of tax for either of the years in issue was due to fraud under section 6653(b). FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioner resided in Treasure Island, Florida, at the time of the filing of the petition in this case. Petitioner filed his income tax returns for calendar years 1976 and 1977 with the Director, Internal Revenue Service Center, Chamblee, Georgia. During the years 1976 and 1977, petitioner was not married. During 1976 petitioner applied funds at least in the amount of $15,867.74 as follows: Increase in bank accounts
(checking, saving, etc.)
$ 339.43
Payments on business autos
purchased for resale
1,721.95
Payments on real estate
purchased -- Costa Brava condominium
4,030.39
Payments on personal assets
acquired (auto, furniture, etc.)
1,476.62
Personal living expenses
actually paid by checks 7,811.18
1976 FICA taxes withheld
164.27
1976 withholding taxes
323.90
Total funds applied during 1976
$15,867.74
*414 During 1976, petitioner recorded sources of funds in the following amounts: Loans received from Bill Sullivan
$4,000.00
Salary from Nichols, AMC
2,801.42
VA pension
3,064.00
Total funds received
$9,865.42
On his 1976 Federal income tax return, the only income reported by petitioner was from salary in the amount of $2,801.42. During 1977 petitioner applied or expended funds of at least $325,092.50 as follows: Item
Amount Expended
Loans to third parties
[2] $ 87,170.00
Purchase of automobiles
11,689.10
Payments on real property
[3] 30,799.41
Purchase of Apex I boat
[4] 125,000.00
Improvements on Apex I
10,620.37
Payment on Three Winters boat [5]
9,604.93
Payment on Egg Harbor (Norpat) boat [6]
29,222.92
Payment on Stamas boat
1,379.77
Personal living expenses
15,172.98
Repayment of loans
[7] 4,433.02
Total expended in 1977
$325,092.50
*415 During 1977, petitioner had recorded sources of funds in the following amounts: Loans received from Carl Jergins
$ 1,550.00
Loans received from Marie E. Powell [8]
3,000.00
Salary from John Hatfield's Autohaus
3,200.00
VA Pension
5,245.91
Interest income (reported)
800.00
1975 income tax refund
627.60
1976 income tax refund [9]
323.90
Total funds applied 1977
$14,747.41
On his 1977 Federal income tax return, petitioner reported income in the amount of $4,000. Petitioner did not receive any inheritances or gifts during taxable years 1976 and 1977. Petitioner's name appears as the customer's signature *416 on a contract dated November 15, 1976, which named Hatfield Autohaus, owned by John Hatfield, as purchaser, and Steering Wheel, Inc., of Fort Lauderdale, Florida, as seller, for the purchase of a 1973 Maserati Bora and a 1972 Maserati Ghibli. The contract showed a $31,500 purchase price for the two automobiles and the sales contract was marked paid in full. Hatfield Autohaus received title to both cars. Petitioner was an employee of Hatfield Autohaus in 1977 and had some working arrangement with Hatfield Autohaus in 1976. On May 6, 1977, petitioner took title to a 1968 used 50-foot Grand Banks boat (Apex I). The price of the boat was $125,000 and the seller was Marlow Marine Sales, Inc. (Marlow Marine) of Sarasota, Florida. In payment for the Apex I, petitioner traded in the 1973 Maserati Bora which had been purchased in the name of Hatfield Autohaus on November 15, 1976. The car was afforded a trade-in allowance of $20,000. Petitioner used the sales tax number of the Hatfield Autohaus dealership in acquiring title to the Apex I. At the time of trial, March 19-22, 1984, petitioner had paid nothing to Hatfield Autohaus for the value of the Maserati which was used on May 6, 1977, as *417 a trade-in on the Apex I. The amount of $105,000 of the purchase price of the Apex I, was paid by a check of Apex Consulting Co. (ACC), a Grand Cayman Island corporation. The $105,000 check which was dated May 20, 1977, was made payable directly to Marlow Marine and was drawn on the account of ACC at the Canadian Imperial Bank of Commerce. Petitioner signed a document denominated promissory note for $105,000 bearing a date of May 1, 1977, stated to be payable to the order of ACC with interest at the rate of 7-1/2 percent per annum. The document stated that principal and interest were due on or before May 1, 1982. The document was notarized by John Hatfield. In 1977, improvements in the amount of $10,620.37 were made to the Apex I. Jeffrey Searles, who was the sole shareholder of ACC, introduced petitioner to ACC and assisted in arranging for the payment of the $105,000 by ACC to Marlow Marine. In October 1975, Jeffery Searles was convicted in the Criminal Court of Hamilton County, Tennessee, of felonious possession of marijuana with intent to sell or deliver and was sentenced to 1 to 5 years in the Tennessee State Penitentiary. In June 1975, Jeffrey Searles was convicted *418 in the United States District Court in Detroit, Michigan, for possession of marijuana with intent to distribute, and in August 1977 was convicted by the United States District Court for the Middle District of Florida for willfully and knowingly making a false statement for a passport and was sentenced to 1 year in a Federal correctional institution. Later in 1977, Mr. Searles was incarcerated in the Federal Correctional Institution in Texarkana, Texas. He was paroled in 1978 to a detainer of Tennessee and was paroled from the Tennessee State Penitentiary in Nashville, Tennessee, on November 9, 1979. At the time of the trial of this case (March 19-22, 1984) Mr. Searles was a fugitive from justice, being under indictment under 18 U.S.C. sec. 3150 because he failed to appear as required on June 22, 1981, before a Federal Magistrate in Tampa, Florida, after having been arrested for an alleged Federal drug abuse violation and granted bail. Petitioner executed a document dated May 1, 1977, entitled "Security Agreement" (chattel mortgage), which recited that to (1) secure the payment of an indebtedness in the amount of $105,000 with interest due ACC on or before *419 May 1, 1982; and to (2) secure the payment of an indebtedness in the amount of $80,000 with interest due ACC on or before January 1, 1982; and to (3) secure any other indebtedness of petitioner to ACC now existing or hereafter arising, petitioner conveyed to ACC a security interest in and mortgaged to ACC the Apex I. At the request of Jeffery Searles, an attorney practicing in Dade City, Florida, prepared the security agreement and chattel mortgage sometime in 1977. Contrary to this attorney's normal practice, he did not obtain a signature on the document and have it notarized and recorded. Instead, he gave the document, unsigned, to Mr. Searles. The document bears petitioner's signature and a notarization by John Hatfield. The document was not recorded. On August 3, 1977, petitioner purchased a partially completed car lot located at 9945 66th Street North, Pinellas Park, Florida, from Alan Kay as trustee. The purchase price of the property was $51,000, and $24,000 of this amount was supplied to petitioner by ACC. Petitioner assumed a mortgage executed by the previous owners in the amount of $26,371.12 and paid cash in the amount of $23,955. Petitioner executed a document *420 entitled "Second Mortgage," granting a security interest in the Pinellas Park property to ACC to secure the $24,000 loan. The mortgage deed was prepared by the same attorney who prepared the document entitled "Security Agreement" with respect to the Apex I. This document also was given by the attorney unsigned to Mr. Searles, contrary to the attorney's usual procedure. Petitioner's signature on this document is notarized by John Hatfield. The document was not recorded. Petitioner signed a document entitled "Note" for $24,000 with interest at the rate of 7-1/2 percent per annum with the principal and interest due on or before August 1, 1982. [10]
On February 14, 1977, petitioner loaned Norman *421 G. Hamill $80,000. On February 14, 1977, Mr. Hamill signed a promissory note wherein he promised to pay petitioner $80,000 plus 9-1/2 percent interest per annum by February 14, 1982. Mr. Hamill paid interest to petitioner in the amount of $3,800 in August 1977. Petitioner obtained the $80,000 he lent to Mr. Hamill from ACC. Petitioner was initially referred to ACC by Jeffrey Searles who had bought a Maserati from petitioner in 1975 or 1976. On February 2, 1977, an $80,000 check to petitioner from ACC was sent to petitioner at Jeffrey Searles' mailing address. The letter was signed by Mr. R. Rees on behalf of ACC and stated the following: As arranged we are enclosing a cheque for U.S. $80,000.00. This represents the proceeds of a loan which is due and payable on the 1st January, 1982. Interest will be at the rate of 7-1/2% and payable annually on the 5th February. I am enclosing a Note with the request that your please sign and return to me as soon as possible. Petitioner executed a document entitled "Promissory Note" dated February 2, 1977, which recited that petitioner agreed to pay ACC on or before January 1, 1982, $80,000 at an interest rate of 7-1/2 percent per annum.
*422 On October 24, 1977, Marie E. Sullivan signed one of petitioner's checks in the amount of $3,000. The check was made out to ACC and in the lower left corner of the check appeared the notation "interest payment." Petitioner married Marie E. Powell on April 15, 1978. On July 15, 1981, Norman G. and Patricia A. Hamill sold petitioner an unfurnished home in Tierra Verde, Florida, for a total purchase price of $290,000. The house was initially listed at a price of $325,000. The total purchase price was paid as follows: 1. Upon the signing of the contract, petitioner released the $80,000 promissory note dated February 14, 1977, that petitioner had received from Mr. Hamill for $80,000 credit on the purchase price of the house. 2. Petitioner paid $40,000 in cash and executed a 20-year purchase money mortgage and note bearing 15 percent interest for the remaining $170,000. The monthly payments of principal and interest were $2,238.55. The entire amount of the note was due and payable in 3 years from the date of the execution of the mortgage and there was a $18,000 penalty if the note was paid off within the first 3 years. 3. The mortgage was a wraparound mortgage and encompassed *423 an existing mortgage on the property in the approximate amount of $60,000. After about 1 year, petitioner sold the house he had bought from the Hamills for $290,000. At that time, petitioner made no payment to ACC with respect to the $80,000 he had obtained from ACC to lend to Mr. Hamill on February 14, 1977. Petitioner released Mr. Hamill from the obligation to pay him the $80,000 when petitioner purchased the house from Mr. Hamill on July 15, 1981. Prior to January 1979, an investigation of petitioner's tax liabilities for the years 1976 and 1977 was begun by agents of the Criminal Investigation Division of the Internal Revenue Service. In January 1979, these agents met with petitioner and advised him of his constitutional rights not to answer questions, and petitioner refused to answer any questions. A special agent later held a conference with petitioner's attorney who agreed to furnish the agent with a cash flow analysis and check spread. The attorney represented to the agent that petitioner had received an $80,000 loan from ACC but did not advise the agent of any other sources of nontaxable income petitioner had in 1976 or 1977, although he was asked to supply the agent *424 with any nontaxable sources of income petitioner had in these years. Prior to May 1980, the special agents had withdrawn from investigating petitioner for criminal purposes, but his returns for 1976 and 1977 were still under audit. On May 27, 1980, two special agents and a revenue agent held a conference with petitioner, his wife, petitioner's accountant and petitioner's attorney. These agents had been informed that petitioner would cooperate with them in their investigation of his tax liabilities and in the tax liability of another taxpayer. Petitioner, however, refused to answer any questions about ACC. He told the agents that he had no loans that were collateralized and that the boat, Apex I, was not used for collateral to obtain a loan. During a later meeting between respondent's agents and petitioner in July 1980, petitioner first mentioned loans from a Panamanian corporation called Terra Investment and Trading Corp. (Terra Investment). Petitioner addressed a letter to ACC, dated July 7, 1981, stating that he had entered into an agreement on June 15, 1981, to sell the Apex I to Hudson Eugene Holloway, who, according to petitioner's statement in the letter, had agreed *425 to repay petitioner's loans from ACC in the amounts of $105,000, $24,000, and $80,000. In this letter, petitioner requested that ACC sign a consent and release that would release petitioner of all further obligations to ACC, since Mr. Holloway would be assuming these debts. Petitioner also requested in the letter that (1) ACC return the original notes he had signed and the original mortgage dated August 1, 1977, which secured the $24,000 note; (2) if ACC had recorded the mortgage, petitioner requested that ACC sign the enclosed Satisfaction of Mortgage, have the signature witnessed and notarized, and return it to petitioner so he could remove the mortgage from the public records of Pinellas County, Florida. Petitioner received a letter which showed a signature of Anthony V. Bernard, corporate director of ACC, wherein receipt of petitioner's letter of July 7, 1981, is acknowledged. The letter stated that ACC's principal would be contacted for instructions and would be in touch with petitioner. Hudson Eugene Holloway operated the North Tampa Airport which, according to a deed recorded in Pasco County, Florida, was owned by ACC and leased to Mr. Searles and others. He was convicted *426 on September 16, 1982, in the United States District Court for the Middle District of Florida of conspiring to commit an offense to defraud the United States under 18 U.S.C. sec. 371 and was sentenced to be incarcerated at the Federal Correctional Institution in Lexington, Kentucky, for a period of 5 years. He had staged his own apparent drowning at sea in order to collect $16 million in life insurance proceeds. [11]
Petitioner engaged an attorney to correspond with ACC in connection with the transfer of the Apex I to ACC. This attorney wrote a letter dated April 30, 1982, to ACC and enclosed copies of an agreement dated April 29, 1982, which provided that petitioner had received $15,000 *427 and would use these funds to repair the vessel and bring it to "yacht condition." Petitioner agreed to transfer any unused portion of the funds to ACC. The attorney requested ACC's signature on the agreement. The attorney stated that the renovation of the boat, bringing it to "yacht condition," would be completed by approximately June 1, 1982, and that ACC could take possession of the boat after signing the agreement. On June 28, 1982, the attorney wrote another letter to ACC stating he had not received a response to the letter dated April 30, 1982. On October 26, 1982, the attorney again wrote to ACC stating that he had not received a response to either the April 30, 1982, letter or the June 28, 1982, letter. The attorney stated in the October 26, 1982, letter that petitioner was having the boat transported to California, where the selling market for the boat would be more favorable. The attorney requested an extension of the due date of petitioner's loans until the Apex I could be sold. During the course of their investigation of petitioner's tax liabilities for 1976 and 1977, respondent's special agents attempted to obtain records of ACC but were refused any access to such *428 records under the secrecy laws of the GrandCayman Islands. Petitioner had the Apex I insured for $223,500 during the year 1981 and prior thereto. Soon after petitioner took title to the Apex I, Mr. Searles used the boat on a number of occasions. On one of those occasions, in September 1977, an agent of the Florida Department of Law Enforcement took pictures of Mr. Searles and a James Thrasher, who had previously been convicted of smuggling drugs, and certain other persons using the boat. On December 1, 1977, petitioner and Mr. Hamill purchased a 38-1/2 foot fiberglass pleasure boat called the Egg Harbor (Norpat) from Goesta Bertil Gason Niebling, II (Gus Niebling), for $69,000. Mr. Hamill gave Gus Niebling $40,000 in cash and petitioner gave Gus Niebling a check in the amount of $29,000. On December 2, 1977, petitioner obtained $30,000 from Marie E. Powell so that he could purchase the Norpat. Marie E. Powell, who married petitioner on April 15, 1978, did not require petitioner to sign a promissory note for the $30,000. Gus Niebling transferred title to the Norpat solely to petitioner. [12]
*429 On April 10, 1978, petitioner paid sales tax on the Norpat in the amount of $1,160, which was based on 4 percent of the alleged $29,000 purchase price. In order to repay Marie E. Powell, petitioner obtained $30,000 from Terra Investment. On December 19, 1977, petitioner deposited a $30,000 check and $2,000 cash into his checking account at the Central Plaza Bank & Trust Co. in St. Petersburg, Florida. After receipt of the funds from Terra Investment, petitioner repaid $27,000 to Marie E. Powell by a $2,000 personal check dated December 19, 1977, and a $25,000 personal check dated December 20, 1977. The checks were drawn on petitioner's checking account at the Central Plaza Bank & Trust Co. in St. Petersburg, Florida. Petitioner repaid the remaining $3,000 he owed to Marie E. Powell by giving her a $3,000 credit when petitioner sold Marie E. Powell his condominium located in La Costa Brava. The controlling shareholder of Terra Investment was Brian E. Goldner, who was reported to have been killed in a plane crash on June 28, 1983. On November 25, 1977, petitioner signed a document entitled "Promissory Note," written in Spanish, [13] in which he promised to repay Terra Investment *430 $30,000 within a maximum period of 2 years at an annual interest rate of 12-1/2 percent. The "note" stated that the loan was for the purchase of a boat. On May 23, 1979, petitioner had sold the Norpat for $75,000 or $80,000 and he sent Terra Investment a cashier's check in the amount of $35,600. This amount was stated to include repayment of principal in the amount of $30,000 and interest in the amount of $5,600, computed at 12-1/2 percent over 18 months. Across the top portion of the note, which provided for the $30,000 indebtedness, the word "cancelled" was handwritten with a signature, Brian E. Goldner. On October 6, 1977, petitioner received $25,000 from Terra Investment. Petitioner signed a document in the form of a promissory note dated October 6, without the year being shown, which provided that "On demand I promise to pay to the order of Herman W. Goldner, Trustee" the amount of $25,000 with interest at the rate of 10 percent per annum. Brian E. Goldner's father is Herman W. Goldner, who is a retired Florida attorney. Herman Goldner prepared the document signed by petitioner. Petitioner signed a document *431 dated October 6, 1977, reciting that for the purpose of securing "full payment of [the 'note'] at maturity, * * * do give unto Herman W. Goldner * * * a mortgage lien upon * * * The Vessel THREE WINTERS." On June 14, 1977, petitioner had purchased the 1967 Three Winters from Hugh Scherschel and for sales tax purposes stated the purchase price of the boat to be $5,000. Petitioner paid Mr. Scherschel $2,743 on May 21, 1977, and $3,000 on June 9, 1977. The document petitioner signed making the Three Winters security was prepared by Herman W. Goldner, who also witnessed its execution. On August 2, 1978, petitioner drew a check to Terra Investment in the amount of $208.33 which he sent to Herman Goldner. On January 17, 1978, [14] petitioner drew a check to Terra Investment in the amount of $208.33 and on July 25, 1978, he drew a check to Terra Investment in the amount of $1,041.65. Both of these checks were sent to Herman Goldner. Shortly after petitioner ceased making payments to Herman Goldner, Mr. Goldner contacted his son, Brian, and Brian told his father to send the documents to him and have no more concern with them. Herman Goldner sent the documents to his son, Brian. After *432 Herman Goldner received the report of his son's death, he went to Honduras, where his son had lived. He went through his son's papers but was unable to find either the original of the "note" or the "chattel mortgage" among these papers. Petitioner sold the Three Winters in 1980 to a Mr. Levine for approximately $8,000 but made no payment on the claimed $25,000 note nor had he made any payments, other than to the extent the three checks listed above are considered such payments, at the date of the trial of this case. In 1975, petitioner purchased a Maserati from Dave Heinz Imports in Tampa, Florida, and financed the $23,000 purchase price by borrowing money from a personal friend, Henrietta Sally. Mrs. Sally required that petitioner sign a promissory note evidencing the $23,000 loan. She had the car parked in her driveway. The title to the car remained open. When petitioner sold the Maserati to Mr. Searles, he received cash plus a Corvette *433 as a trade-in, and he repaid Mrs. Sally $15,000, leaving an unpaid balance owed to her in the amount of $8,000. Mr. Searles was not satisfied with the Maserati and returned it to petitioner, who sold the car for him. On September 14, 1976, petitioner signed an installment note in which he promised to pay Mrs. Sally the principal sum of $8,000 with interest at the rate of 10 percent per annum. The stated interest and principal payments were $258.14, due on the 15th day of each month for 36 months. Petitioner repaid the $8,000 loan that he had borrowed from Mrs. Sally in full. After 1977, Mrs. Sally made additional loans to petitioner in the amounts of $500 and $1,000. In 1978, Mrs. Sally loaned petitioner approximately $20,000 to purchase a yellow Mercedes that was titled in Mrs. Sally's name. When petitioner sold the car, he repaid Mrs. Sally the $20,000 he had borrowed. Joseph F. Murrman, a Florida resident who shortly prior to the trial of this case had been in the GrandCayman Islands, obtained a document dated February 13, 1984, which was entitled "Power of Attorney." This document showed a signature of Victor Earl Simpson as president of ACC. Pursuant to the document, *434 Mr. Murrman was authorized to collect the balances petitioner owed with respect to an $80,000 and a $24,000 loan that petitioner had received from ACC. The document recited that the power of attorney was effective from February 13, 1984, through December 1, 1984. At the time of trial, March 19, 1984, petitioner had made no payments of either principal or interest with respect to the $104,000 that the document entitled "Power of Attorney" recited was owed by petitioner to ACC. The State of Florida brought an action for forfeiture of the North Tampa Airport on the basis that it was used for illicit drug trafficking. The Circuit Court of the Sixth Judicial Circuit of the State of Florida forfeited the North Tampa Airport to the State. This order was on appeal at the time of the trial of this case. In connection with that suit, interrogatories were addressed to ACC. The interrogatories were answered on October 3, 1983, under oath on behalf of ACC by Victor Earl Simpson who stated he was president and director of ACC, that he "took possession" of ACC on December 1, 1982, and that the sole stockholder of ACC was and had from the inception of the company been Jeffrey L. Searles. In *435 response to the request to identify all persons to whom ACC had granted loans or credit in excess of $1,000, with the date and amount or nature of each loan or extension of credit, Mr. Simpson replied "No one." Respondent in his notice of deficiency determined that petitioner understated his income for the calendar years 1976 and 1977 in the respective amounts of $4,280.37 and $310,838.83. Respondent used the source and application of funds method for determining petitioner's taxable income for the years in issue with the following explanation: a. In the absence of adequate records, your gross receipts for the tax years 1976 and 1977 have been computed by reference to cash expended and cash available. Accordingly, income for the tax years 1976 and 1977 is increased by $4,280.37 and $310,838,83, respectively, as follows: 1976
1977
Business receipts
(Exhibits A and B)
$6,002.32
$314,527.93
Less: Allowable business
expenses
1,721.95
3,689.10
Net profit corrected
$4,280.37
$310,838.83
Net profit reported
Increase
$4,280.37
$310,838.83
Petitioner admits that he has no explanation for his expenditures in 1976 in excess of sources allowed by respondent *436 in the computation in the notice of deficiency, but contends that $262,000 of the amount respondent has determined to be taxable income in 1977 and the $20,000 allowed as a trade-in on the Apex I were from loans. [15]
OPINION The source and application of funds method, employed by respondent to compute petitioner's taxable income in this case, has been long accepted by this Court. Vassallo v. Commissioner,23 T.C. 656, 661-662 (1955). [16] Basically, this method is based on the assumption that the amount by which the taxpayer's application of funds or expenditures during a taxable year exceeds his known sources of income for the same period, is taxable income absent *437 a showing by the taxpayer of a nontaxable source such as loans, gifts, inheritances, or assets on hand at the beginning of the taxable period. It is incumbent upon petitioner to show specific errors in respondent's calculations using this method, or in the alternative, show that another method more clearly reflects his income. Respondent's determination under this method is presumptively correct. In the instant case petitioner's only claim of error in respondent's computation is the failure to give credit for loans. Therefore our only issue with respect to respondent's computation of petitioner's income is whether petitioner had sources of income from bona fide loans which were not allowed in respondent's computation. Whether the amounts received by petitioner were nontaxable loans or taxable *438 income is a question of fact. Beaver v. Commissioner,55 T.C. 85, 91 (1970); Fisher v. Commissioner,54 T.C. 905, 909 (1970). The factual question is whether a bona fide debtor-creditor relationship existed between petitioner and the persons from whom he claimed to have borrowed money. The resolution of the question depends on the existence of an actual intent at the time the money was advanced to petitioner that petitioner repay the money and an intent on the part of the lender to enforce repayment. Berthold v. Commissioner,404 F.2d 119, 122 (6th Cir. 1968), affg. a Memorandum Opinion of this Court. Petitioner argues that he has established many facts which are among the factors considered to indicate that an advance of funds is a loan because of the intent on the part of the lender to collect and the borrower to repay. Petitioner states that there were notes issued for the claimed indebtednesses, maturity dates were stated, provision was made for the payment of interest and there was collateral to secure the advances. All these factors have been held to indicate bona fide loans rather than a lack of intent to repay. See Dean v. Commissioner,57 T.C. 32, 43-44 (1971); *439 Berthold v. Commissioner,404 F.2d 119, 122 (6th Cir. 1968), affg. a Memorandum Opinion of this Court. If we put any credence in the testimony of petitioner in this case, we might be impressed by these claimed factors indicating an indebtedness. However, from petitioner's testimony as a whole we conclude that he was not telling all facts within his knowledge concerning the claimed loans. Many of his statements were contradicted by other evidence in the record. Petitioner's testimony was so evasive that we do not accept any of his statements as true other than those facts supported by other evidence in the record and certain statements which we effectively consider to be admissions against interest. Because we do not believe petitioner's testimony, we look to the other evidence to determine what has been established in the record. Initially, we cannot overlook the fact that John Hatfield, who purportedly lent petitioner an automobile to trade in on the Apex I and who notarized many of the various "notes" and "security agreements" purportedly given by petitioner, was not called as a witness, and no explanation was given for not producing his testimony. Secondly, *440 we have no confidence in any purported action taken by petitioner after a criminal investigation was commenced in early 1979 by special agents of the Internal Revenue Service of his tax liabilities for 1976 and 1977. Also, we do not believe petitioner's claimed lack of knowledge of the affairs of ACC. Finally, we do not believe that a person with the lack of assets and earnings that petitioner professed would receive bona fide loans in the amounts petitioner claims to have borrowed. Also influencing our conclusion as to the claimed evidences of indebtedness to ACC is the fact that when the various documents were drawn, the drafting attorney, contrary to his normal practice, did not obtain signatures on the documents but rather gave the documents to Mr. Searles. The attorney had no knowledge of what was done with the documents after he gave them to Mr. Searles. The lack of any notations on the title to the boat, which was alleged security for the loans from ACC, or any recording of any of the documents further causes us to place no confidence in the purported evidences of indebtedness. Reliance by petitioner in his brief on Mr. Murrman's authority to collect the $80,000 and $24,000 *441 claimed loans from ACC to petitioner is unimpressive. In the first place, the alleged power of attorney to Mr. Murrman to collect the "notes" was dated February 13, 1984, approximately 1 month prior to the trial of this case. Secondly, the alleged copy of the $24,000 "note" was totally different from the alleged "note" that petitioner claimed to have executed, both as to date and to contents. In addition, Mr. Murrman claimed his power of attorney came from the then alleged president of ACC, Mr. Simpson. Mr. Simpson previously in a sworn statement in connection with the forfeiture suit in the State court had stated that ACC had no outstanding loans in excess of $1,000. Also, there is no explanation in the record of why petitioner did not repay the $80,000 alleged loan when he sold the house of which he had been allowed credit for the $80,000 loan he made with the claimed borrowed $80,000. Based on this record, we find no evidence to substantiate that the $80,000 advance to petitioner by ACC and the $24,000 advance were in fact loans. There is somewhat more evidence in the record with respect to the $105,000 which petitioner claimed was a loan to pay part of the purchase price *442 of the Apex I and the $25,000 which petitioner claimed he borrowed from Terra Investment. The $105,000 claimed loan was advanced by a check of ACC's drawn directly to Marlow Marine, the seller of the Apex I. Therefore, clearly this amount was connected with the purchase of the Apex I. The difficulty is the small amount of credible evidence as to the reason for the purchase of the Apex I and who was truly the equitable owner of that boat. Title to the Apex I was taken in petitioner's name, and petitioner testified that he bought the boat for resale. However, petitioner made no showing of any effort to sell the boat, despite the fact that he spent over $10,000 in 1977 to rapair it, prior to the time of the alleged sale to Hudson Eugene Holloway in July 1981. Certainly the evidence here does not support an unconditional loan to petitioner of the $105,000 to enable petitioner to purchase a boat for resale as petitioner contends. However, the inference from the record is that the $105,000 was a payment by ACC, solely owned by Mr. Searles, for either a partial or total equitable interest in the Apex I. Although this is not clearly established in the record, in our view there is a *443 slight preponderance of evidence in favor of concluding that the $105,000 was not income to petitioner. We do not come to this same conclusion with respect to the $20,000 value of the Maserati on the basis of the facts in the record. This automobile was registered in the name of petitioner's employer in 1977. There is no showing of why Mr. Hatfield did not require petitioner to sign any document in connection with the loan of the automobile or why he made to effort to obtain the $20,000 from petitioner. In fact, there is no showing that Mr. Hatfield may not have in some way been reimbursed by Mr. Searles or from some other source for this $20,000. Again, Mr. Hatfield has not been shown to be unavailable as a witness, but he was not called. In our view, the record shows that the $30,000 which petitioner obtained from Terra Investment in November 1977 was repaid approximately a year and one-half later. Although the record leaves much to be desired with respect to this purported loan, we conclude that the preponderance of the evidence supports petitioner's contention that this $30,000 was a loan. The same situation does not prevail with respect to the $25,000 which petitioner *444 claimed he borrowed from Terra Investment in October 1977. The record does show that Herman Goldner initially considered this advance to be a loan, but it was not Herman Goldner but Brian Goldner who purportedly made the loan to petitioner through Terra Investment. Certainly if the $25,000 was ever considered as a loan, the inference is clear that the indebtedness was forgiven the following year. In our view, the evidence with respect to the $25,000 purported loan from Terra Investment is not sufficient to carry petitioner's burden of establishing that in October 1977 there was in fact a loan made with the intent of the lender to collect it and the borrower to repay it. We cannot overlook the fact that according to Herman Goldner the note petitioner signed and the purported mortgage on the boat, the Three Winters, securing the note, was sent to his son, Brian, at Brian's request when Herman Goldner was proposing to take steps to collect on the note. No efforts to collect were made by Brian Goldner and when Herman Goldner went to Honduras after the report of his son's death in a plane crash, he was unable to find the note and mortgage among his son's papers. The record also shows *445 that petitioner sold the Three Winters which was the purported security for the note but made no payment on the note. Petitioner testified that he obtained the consent of Brian Goldner to sell the Three Winters, but his testimony in this regard is no more reliable than the balance of his conflicting testimony. On this record we conclude, because of petitioner's failure to proof to the contrary, that the $25,000 petitioner received in October 1977 from Terra Investment was not a bona fide loan. In connection with the two advances from ACC totaling $104,000, we cannot overlook the fact that petitioner, according to his testimony, had insured the Apex I for $223,500 after purchasing it for $125,000 and making repairs in the approximate amount of $10,000. Likewise, we have difficulty with petitioner's testimony that in July 1981 he reported the disappearance of the Apex I to State and Federal authorities since this testimony is not substantiated by any copies of reports given to the State and Federal authorities. We also have difficulty with petitioner's statement that after the boat disappeared he filed no claim with the insurance company and made no attempt to collect on the $223,500 *446 insurance. Certainly if the Apex I was security for a loan to petitioner from ACC, he would have felt obligated to make an insurance claim to repay the loan if he was otherwise unable to repay it. Since petitioner has the burden of showing error in respondent's determination and, except with respect to the $105,000 claimed initial loan from ACC and the $30,000 claimed loan from Terra Investment discussed above, has totally failed to carry his burden, we sustain respondent's determination with respect to the other contested items. The final issue to be decided is whether respondent's determination of additions to tax under section 6653(b) is to be sustained. Respondent has the burden of proving by clear and convincing evidence that petitioner is liable for the addition to tax under section 6653(b). Section 7454(a); Rule 142(b), Tax Court Rules of Practice and Procedure. The existence of fraud is a fact which must be determined on the basis of all facts and circumstances. Estate of Pittard v. Commissioner,69 T.C. 391, 400 (1977). Fraud means "actual, intentional wrongdoing, and the intent required is the specific purpose to evade a tax believed to be owing. *447 " Mitchell v. Commissioner,118 F.2d 308, 310 (5th Cir. 1941). Fraud is not to be imputed or presumed, Otsuki v. Commissioner,53 T.C. 96, 106 (1969), and the mere failure to report income is not sufficient to establish fraud. Merritt v. Commissioner,301 F.2d 484, 487 (5th Cir. 1962), affg. a Memorandum Opinion of this Court; Otsuki v. Commissioner,supra at 106. The taxpayer's entire course of conduct must be examined. Stone v. Commissioner,56 T.C. 213, 224 (1971). With respect to the fraud issue, respondent takes the view that petitioner's consistent and substantial understatement of income over a protracted period of time is evidence of fraud. In addition, respondent cites petitioner's unexplained increases in net worth, petitioner's unfettered use of large sums of currency without adequate explanation, petitioner's use of nominees to purchase assets and maintain investments and petitioner's use of fictitious loans as evidence of fraud. Respondent also places great emphasis on petitioner's involvement with convicted felons as evidence of petitioner's fraudulent intent. A consistent *448 and intentional understatement of income is some evidence of fraud. When the consistent and intentional understatement of income is accompanied by other so-called badges of fraud, it may constitute clear and convincing evidence that the proven understatements are the product of an intent to evade tax. Cefalu v. Commissioner,276 F.2d 122, 129 (5th Cir. 1960), affg. a Memorandum Opinion of this Court; Merritt v. Commissioner,supra;Vannaman v. Commissioner,54 T.C. 1011, 1018-1019 (1970). We will not sustain a finding of fraud upon circumstances which at the most only create suspicion of fraud. Green v. Commmissioner,66 T.C. 538, 550 (1976); Switzer v. Commissioner,20 T.C. 759, 765 (1953). We have concluded that petitioner has not carried his burden of proof with respect to respondent's determination that he failed to report a substantial amount of taxable income for taxable year 1977. However, the underreported income in 1976 was relatively small. There is no evidence of repeated understatements of income by petitioner in successive years and no evidence of concealment by petitioner of *449 his funds. A taxpayer's failure to sustain his burden of showing that respondent's determination of his income is in error does not prove that the taxpayer understated his income with an intent to evade taxes. Respondent's allegation that petitioner received unreported income from an illegal activity due to his association with convicted felons does not substitute for evidence. It is significant to note that a special agent with the Florida Department of Law Enforcement in Pipellas County, Florida, investigated petitioner's activities during 1976 and 1977 in search of evidence of petitioner's involvement in narcotics trafficking or drug smuggling in the State of Florida. During that time, the special agent failed to find sufficient evidence to support an indictment of petitioner on drug-related or any other charges of illegal activity. Although intent is a state of mind, it is nonetheless a fact to be proven by the evidence. Respondent has not presented evidence to prove petitioner's intent to defraud. Accordingly, we conclude that respondent has failed to show by clear and convincing evidence that any part of petitioner's underpayment of taxes in the years here in issue was *450 with an intent to evade a tax he believed to be owing. We might here note that respondent did not call Mr. Hatfield in an effort to prove petitioner's receipt of income but rather relied on petitioner's failure to meet his burden of proof.Also, respondent did not call Mr. Holloway to prove his understanding of any agreement petitioner claimed to have had with him with respect to the Apex I. Respondent has failed to carry his burden of proof that any part of petitioner's underpayment of tax in either of the years here in issue was due to fraud. Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the years here in issue.↩
2. This amount includes an $80,000 loan petitioner made to Norman G. Hamill. Petitioner obtained the $80,000 from Apex Consulting Co.↩
3. Payment
Payment
Not Reflected
Total
By Check
In Bank Account
Expended
9945 66th St. N. Pinellas Park
$2,666.11
$24,000.00
$26,666.11
Costa Brava Condominium
4,133.30
4,133.30
Total
$6,799.41
$24,000.00
Although the exhibit which is in agreement with the C.P.A.'s workpapers shows a payment of $30,799.41, the stipulation reflects a total of $30,799.44. *↩ $30,799.41
4. Apex Consulting Co. paid $105,000 of the purchase price for the Apex I and petitioner traded in a Maserati Bora owned by Hatfield Autohaus. The car was afforded a trade-in value of $20,000. ↩
5. On June 14, 1977, petitioner purchased the 1967 houseboat, the Three Winters, from Hugh Scherschel. On May 21, 1977, and on June 9, 1977, petitioner made payments to Mr. Scherschel in the amounts of $2,743 and $3,000, respectively. On September 1, 1977, petitioner claimed the total purchase price of the boat was $5,000 and paid sales tax in the amount of $200 which was based on 4 percent of the purchase price. There is no evidence of additional financing petitioner may have obtained from Mr. Scherschel when he purchased the boat. ↩
6. The stipulation of the parties lists this payment as $29,222.03 as shown by a stipulated exhibit. The exhibit, however, shows the amount as $29,222.92. ↩
7. ↩
Lender
Amount Paid by Check
Commercial credit
$1,011.72
G.E.C.C.
321.76
H. Sulley [Henrietta
3,099.54
Sally] -- Corvette
Total
$4,433.02
8. On December 2, 1977, Marie E. Powell advanced $30,000 to petitioner so that he could purchase the Egg Harbor (Norpat). A promissory note was not signed for the $30,000 advance. Petitioner borrowed $30,000 from Terra Investment and Trading Corp. and paid Marie E. Powell $2,000 on December 19, 1977, and $25,000 on December 20, 1977, leaving $3,000 as the unpaid balance petitioner owed to Marie E. Powell in 1977. Petitioner married Marie E. Powell on April 15, 1978. ↩
9. The stipulation incorrectly states the 1976 income tax refund was $322.70.↩
10. Two purported copies of this note were offered by petitioner as exhibits and were received in evidence. One of these documents is dated August 1, 1977, and the other is dated August 3, 1977. There are other differences in the documents. The "note" dated August 1, 1977, recites that it is secured by a mortgage and the "note" is payable if the property is sold. The other "note" has no such recitation. The August 1, 1977, "note" is notarized by John Hatfield. The other is not.↩
11. Petitioner testified that he received a $5,000 deposit from Hudson Eugene Holloway on the Apex I and delivered the boat to him so that he could take it to Tampa for a survey. Petitioner testified that thereafter through Brian Goldner he located the Apex I in Honduras, placed the boat in a marina and started repairing it. He further testified that after the boat was repaired he hired a captain to take it to the West Coast for sale, but on the way there the boat sank.↩
12. Petitioner in his testimony denied any knowledge of Mr. Hamill's having any interest in the Norpat or making any payment on its purchase price. Petitioner's testimony was that he bought the boat for $29,000. When the Court called to petitioner's attention the persuasive testimony to the contrary by the seller of the boat, petitioner offered no explanation.↩
13. The note was translated into English at the trial.↩
14. On the check appears the date January 17, 1977, but the cancellation date on the back of the check was February 3, 1978. We thus conclude, based on this and other evidence in the record, that the date of the check was January 17, 1978.↩
15. The items petitioner contends were loans actually total $264,000 and are composed of the following: Loans from ACC of $105,000, $80,000 and $24,000, and loans from Terra Investment of $25,000 and $30,000. Other minor adjustments in the notice of deficiency were not contested. However, apparently petitioner does contest the $20,000 that was credited on the Apex I from the automobile owned by Hatfield Autohaus, although it is not specifically listed by petitioner as a loan to him in 1977.↩
16. See also Christensen v. Commissioner,T.C. Memo. 1982-235; Bazen v. Commissioner,T.C. Memo. 1977-431; Lee v. Commissioner,T.C. Memo. 1977-124; Stutts v. Commissioner,T.C. Memo. 1975-298; Pulliam v. Commissioner,T.C. Memo. 1971-121; Troncelliti v. Commissioner,T.C. Memo. 1971-72↩.